UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
ARBOR NETWORKS, INC.,                         )
                                              )
            Plaintiff,                        )
                                              )        C.A. No. _____
v.                                            )
                                              )
WILLIAM E. RONCA III, RICHARD SHIRLEY,        )
DOUGLAS FLEMING, JAMES GILL, JAMES            )
NEEL, JASON MCEACHIN, MICHAEL L.              )
PORTER, ANDREW HENKART, PAUL                  )
SCANLON, MICHAEL HOLLYMAN, and                )
RED LAMBDA, INC.,                             )
                                              )
            Defendants.                       )
_____)

## VERIFIED COMPLAINT

Arbor Networks, Inc. ("Arbor" or "Plaintiff") brings this suit against William E. Ronca,

III ("Ronca"), Richard Shirley ("Shirley"), Douglas Fleming ("Fleming"), James Gill ("Gill"),

James Neel ("Neel"), Jason McEachin ("McEachin"), Michael L. Porter ("Porter"), Andrew

Henkart ("Henkart"), Paul Scanlon ("Scanlon"), Michael Hollyman ("Hollyman") (collectively,

the "Individual Defendants"), and Red Lambda, Inc. ("Red Lambda") (collectively with

Individual Defendants, "Defendants"), and for its causes of action, states as follows:

## INTRODUCTION

1.      Over the span of just fourteen months, Red Lambda, a competitor of Arbor in the

network security and anomaly detection industry, systematically raided and hired ten former

Arbor employees when it knew or should have known of their contractual obligations to Arbor,

including covenants not to compete, agreements not to solicit Arbor customers or employees,

and agreements prohibiting the misuse of Arbor's confidential business information.  Red

Lambda first hired Ronca, the former Vice President of America Sales at Arbor, who later acted as the "pied piper" in hiring away Arbor's employees, including teams of salespeople and technical engineers.   Upon information and belief, a substantial portion of Red Lambda's sales force now consists of former Arbor employees.

2.      Ronca breached his agreement with Arbor by accepting employment with Red Lambda, an Arbor competitor, just months after his termination from Arbor, and soliciting or encouraging Arbor customers to terminate or modify adversely their relationship with Arbor. Upon information and belief, Ronca breached his agreement with Arbor by soliciting other Arbor employees to work for Red Lambda within the twelve months immediately following his termination, and by disparaging Arbor and its products to Arbor's customers.

3.      The remaining Individual Defendants breached their agreements with Arbor by accepting employment with Red Lambda within twelve months of their departure from Arbor. Upon information and belief, the remaining Individual Defendants also breached their agreements with Arbor by soliciting or encouraging (or working with others to solicit or encourage) Arbor customers to terminate or modify adversely their relationship with Arbor.

4.      Gill and McEachin further breached their agreements by, *inter alia*, permanently deleting all files on their Arbor-issued computers, which they failed to return to Arbor until weeks after the termination of their employment.

5.      Upon information and belief, Red Lambda participated in, encouraged, or directed some or all of the Individual Defendants' unlawful actions.

6.      Arbor brings claims against Gill and McEachin for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* ("CFAA").   Arbor brings claims against each of the Individual Defendants for breach of contract.   Arbor also brings claims against Ronca for

intentional interference with contractual relations.  Arbor brings claims against Red Lambda for intentional interference with contractual relations and violation of Mass. Gen. Laws ch. 93A. Arbor seeks injunctive relief and damages against all Defendants.

PARTIES

7.      Plaintiff Arbor is a Delaware corporation with a principle place of business in Chelmsford, Massachusetts.

8.      Upon information and belief, Defendant Ronca is a citizen of the State of Florida and resides at 610 Ocean Boulevard, Golden Beach, Florida.

9.      Upon information and belief, Defendant Shirley is a citizen of the Commonwealth of Virginia and resides at 21559 Wild Timber Court, Broadlands, Virginia.

10.      Upon information and belief, Defendant Fleming is a citizen of the Commonwealth of Virginia and resides at 7424 Westwood Park Lane, Falls Church, Virginia.

11.      Upon information and belief, Defendant Gill is a citizen of the Commonwealth of Virginia and resides at 435 James Court, Falls Church, Virginia.

12.      Upon information and belief, Defendant Neel is a citizen of the Commonwealth of Virginia and resides at 20387 Middlebury Street, Ashburn, Virginia.

13.      Upon information and belief, Defendant McEachin is a citizen of the Commonwealth of Virginia and resides at 25142 Mineral Spring Circle, Aldie, Virginia.

14.      Upon information and belief, Defendant Porter is a citizen of the State of Colorado and resides at 5448 Twilight Way, Parker, Colorado.

15.      Upon information and belief, Defendant Henkart is a citizen of the State of Colorado and resides at 10802 Eagle Crest Court, Parker, Colorado.

14630535v.10

16.     Upon information and belief, Defendant Scanlon is a citizen of the State of Colorado and resides at 3340 W. 36th Avenue, Denver, Colorado.

17.     Upon information and belief, Defendant Hollyman is a citizen of the State of Colorado and resides at 7180 S. Hudson Circle, Centennial, Colorado.

18.     Defendant Red Lambda is a Florida corporation with its principal place of business in Longwood, Florida.  Upon information and belief, Red Lambda transacts business in numerous states throughout the country.

<u>JURISDICTION AND VENUE</u>

19.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Arbor's claim against McEachin and Gill under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, raises a federal question.  Arbor's remaining claims likewise fall within this Court's supplemental jurisdiction (28 U.S.C. § 1367) because they are so related to the federal claim that they form part of the same case or controversy.  Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

20.     This Court has personal jurisdiction over the Individual Defendants because they have made and performed contracts in Massachusetts and/or have breached duties and/or committed tortious acts in Massachusetts.  This Court has personal jurisdiction over Red Lambda because it has committed tortious acts in Massachusetts by interfering with contracts made and performed in Massachusetts.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this dispute occurred within this District.

14630535v.10

FACTUAL ALLEGATIONS

**A.**     ***Arbor's Business and Confidential Information***

22.     Arbor is a global provider of distributed denial of service ("DDoS") attack protection, network security, and visibility solutions.  It performs detection and mitigation of security threats for both enterprise businesses (typically, large- and medium-sized enterprises such as banks) and carrier businesses (primarily, internet service providers ("ISPs")).

23.     Arbor has two main product lines, the Pravail product line (including the Pravail NSI and Pravail APS products), which is primarily sold to enterprise businesses, and Arbor Peakflow SP ("Peakflow"), which is primarily sold to carrier businesses.

24.     Pravail NSI is a security intelligence solution that is used in an enterprise, government, or university network and allows the customer to monitor the actions of its network users as they relate to the network; for example, it provides customers with data regarding who is accessing the network, where they are accessing it, and when they are accessing it.  Pravail NSI's purpose is to provide intelligence into threats such as malware, botnets, data theft and the inappropriate use of the network.

25.     Pravail APS is used to both continuously monitor all traffic on the Internet border of enterprise or government datacenter networks, and provide pro-active protection against DDoS attacks on such networks.  It is designed as a ready-to-use solution for DDoS protection with little operator intervention required.

26.     Peakflow is a suite of solutions that are built for and marketed primarily towards ISPs, broadband providers, mobile providers, universities, datacenter operators and more complex enterprise networks.  It provides extensive traffic visibility, statistical analysis of traffic on the network and DDoS protection.  When a potential threat to the network is perceived and

5

reported, Peakflow can redirect the threatening traffic to Arbor devices that "clean" and reroute healthy traffic back to the network, thereby defending against DDoS attacks and other threats. Peakflow also gives carrier businesses the ability to partition and deliver data, alerting, and mitigation specific to its own customers (for example, Peakflow allows an ISP to deliver to one of its customers, such as a bank, security services that specifically relate to network traffic to the bank's website).

27.     The network security and anomaly detection industry is a highly competitive, specialized business and is becoming even more so with each passing year.  Many markets and products within the industry are converging and blending together.  Network security products that address different threats are increasingly becoming combined to create comprehensive solutions to customers' network security needs, eliminating the need for customers of these products to use multiple network security providers.

28.     Arbor has invested considerable money and effort to develop trade secrets and confidential business information in the network security and anomaly detection industry.  Since its inception in 2000, Arbor has maintained as confidential certain highly valuable proprietary business information regarding, among other things, its inventions, products, designs, methods, know-how, techniques, systems, processes, software programs, formulae, customer and supplier lists and accounts, business relationships, pricing and costing methods, projects, and non-public financial information.

29.     Arbor stores its customer-related confidential information in a secure proprietary database, the Arbor Sales Portal ("ASP").  Arbor has invested considerable time, effort and expense over twelve years into building the ASP database, at an estimated cost of several million dollars.

14630535v.10

30.     The ASP contains all customer and prospective customer information stored in Arbor's SalesLogix CRM (customer relationship management) system, including, among other things, details of customer orders, maintenance support contracts, details of customer lists, configuration of customer networks, and customer support information.  The information contained in the ASP is gleaned from Arbor's research, customer inquiries, and customer account history.

31.     Only upper management and sales-related employees (such as the Individual Defendants) are granted access to the ASP.  Authorized users must authenticate through a secured virtual private network ("VPN") connection with their valid Arbor username and password in order to access the ASP.

32.     In addition, Arbor provides even more restricted access to highly confidential technical information, including engineering project details and the development and release thereof, on another database known as "Version One."  This database is only available inside Arbor's firewall, thus requiring users to access it inside Arbor's offices or via a secure VPN connection using their unique Arbor username and password.

33.     Additionally, Arbor keeps its confidential source code in a database called "SVN."  Like Version One, this database is only available inside Arbor's firewall, thus requiring users to access it inside Arbor's offices or via a secure VPN connection using their unique Arbor username and password.

34.     In addition, when Arbor employees install Arbor's products for its customers, the customers will occasionally request customization of the product, which is conducted by Arbor's technical specialists, known in Arbor parlance as sales engineers or "SEs," at the customer's site. These customizations, known as "program scripts," are contained at the customer site and on the

7

particular SE's local hard drive.  Due to non-disclosure agreements between Arbor and its customers, these program scripts are protected and may not be shared with anyone outside Arbor or the customer.

35.     The proprietary business information contained on the ASP, Version One, and SVN (as well as the program scripts contained on the SEs' local hard drives) is not available or readily ascertainable to the public (or even, as noted above, much of its workforce) and is considered a closely-guarded trade secret by Arbor.

36.     In part through the use of its proprietary business information and years of business effort, Arbor has been able to develop the trade and the patronage of its clients.  The goodwill developed with its clients depends, in large part, on Arbor's proprietary business information as described above.  This information is integral to Arbor's efforts at developing and maintaining its goodwill and, consequently, constitutes a trade secret and/or proprietary, confidential information.

37.     Because this confidential information is so important to its business, in addition to restricting access to the information, Arbor makes extensive efforts to protect this asset.  For instance, Arbor requires that employees with access to such information execute an employment agreement containing provisions protecting its confidential information.

38.     Arbor also requires all employees to sign, upon commencement of their employment, an Information Security Program handbook (the "ISP Handbook") that lays out Arbor's various policies and procedures related to the security and protection of Arbor's confidential information.

39.     For example, the ISP Handbook provides that "[a]ll computer systems and handheld devices owned or used by Arbor personnel that transmit Arbor confidential information

or connect to network systems containing Arbor confidential information must have a password enabled," which "must enable itself automatically after no more than 15 minutes of non-use of the device." The ISP Handbook provides detailed guidelines as to the creation and confidentiality of complex passwords in order to protect Arbor's confidential information. The ISP Handbook also provides that employees are not to leave desktops or laptops unlocked when away from their desk, and requires that "offices, file cabinets, and file drawers containing Arbor confidential information must always be locked" except when necessary to conduct business. The ISP Handbook further provides that visitors with "laptops and/or mobile devices may only access the public internet via a WIFI network connection . . . [and] are restricted from gaining access to the Arbor corporate network or Arbor-owned system resources without proper credentials and authentication . . . ."

40.     The ISP Handbook, in addition to being provided to new employees for their signature, is published on Arbor's intranet site.

41.     In addition, Arbor has invested heavily in developing its goodwill with its clients based on its investment of time and expense in training, supporting and entrusting its employees, including the Individual Defendants, with its valued customer relationships, and has spent considerable amounts of money over the years to enable the Individual Defendants to entertain and develop clients so as to foster those relationships, determine customer preferences, and produce better products and services based on the customers' unique needs.

42.     For example, Arbor encourages employees (like the Individual Defendants) to entertain customers, and pays all expenses for customer dinners, sporting events, and other entertainment (to the extent they conform to the gift and entertainment policy of Arbor's indirect parent corporation, Danaher Corporation ("Danaher")).

9

43.     Arbor also conducts yearly customer summits attended by Arbor customers, SEs, and salespeople.  These summits take place in Asia, Europe and the United States and will regularly attract nearly 100 customers at each event.   During the summit, Arbor presents on its roadmaps, solutions, company vision, and direction -  all funded by Arbor in developing and maintaining relationships and goodwill with its customers.  All customer attendees must have a confidentiality agreement in place with Arbor (or for prospective customers, must execute one for purposes of attending the summit) in order to participate.

44.     Additionally, many of the Individual Defendants benefited from inherited customer relationships when they joined Arbor.  For example, Porter and Henkart inherited key relationships that Arbor had nurtured for years prior to their employment, including relationships with John Kelly ("Kelly") at Comcast and Henry Yu ("Yu") at tw telecom, inc. ("TWT").

45.     Similarly, virtually all of Ronca's contacts at Arbor were pre-existing Arbor relationships that he inherited, as he had previously been employed by companies that were not involved in the network security industry and had a completely different customer base.  Upon information and belief, Ronca is now using the contacts given to him by Arbor for Red Lambda's behalf.

46.     The Individual Defendants, through their employment with Arbor, gained unique knowledge of Arbor's customers, products and products under development, and business strategy which may be used to gain a competitive advantage against Arbor.  The Individual Defendants had unique knowledge of what Arbor's products could (and could not) do, as well as an understanding of Arbor's development track for years to come.  Specifically, in part by virtue of their access to the ASP, they had access to sales collateral, pricing information, developer comments, bug reports, feature requests from customers, customer identification and contact

information, and Arbor's development plans, among other things.  SEs also had access to highly

confidential technical information (such as engineering project details, source code, and program

scripts) through their access to Version One, SVN, and their local hard drives.

**B.**     ***Red Lambda Is A Competitor Of Arbor***

47.     Red Lambda is a competitor of Arbor.  Red Lambda, like Arbor, performs

detection and mitigation of security threats.  Red Lambda's products purport to provide complete

security visibility into the customer base of Red Lambda's clients by gathering information about

data flowing into the network and analyzing potential threats.

48.     For example, per its website, Red Lambda's MetaGrid Anomaly Detection

product "provides organizations insight into their entire environment, discovering unusual

patterns, events, rates and timelines that in isolation would be lost in an archived log file . . .

[and] *isolates and highlights anomalies* in any system on the network, creating a Zero Event

security posture for recognition of advanced persistent threats as they evolve."  (emphasis

added).

49.     Similarly, Red Lambda's MetaGrid Analytics product performs anomaly

detection and "[d]iscovers unusual patterns, events and timelines deterministically."

50.     Red Lambda's website even draws the comparison between its products and

Arbor's; in a press release announcing Ronca's promotion to Executive Vice President of Global

Sales, Marketing, and Business Development, Red Lambda noted Ronca's previous work with

Arbor, "a pioneer in denial-of-service attack prevention and *network-based anomaly detection*."

(emphasis added).

51.     Red Lambda's products have a very similar value proposition as Arbor's

products:  providing visibility into their customers' networks, including potential threats.  For

example, both Pravail NSI and Red Lambda's products take an anomaly detection approach to try and discover events that are happening on a customer's internal network. While Red Lambda's products may be implemented in a manner that differs from Arbor's, both companies' products seek to solve the same problem and the end results are similar – tracking down and presenting undesirable behavior of users on the network.

52.     In addition, from a budgetary perspective, Red Lambda's products compete with Pravail NSI for internal security intelligence business. Enterprises will likely choose a single solution to buy at any time in this space.

53.     Upon information and belief, Red Lambda targets the same customer base as Arbor in order to sell its products in the network security space. Upon information and belief, Red Lambda is marketing to both the carrier and the enterprise businesses that Arbor services.

54.     Upon information and belief, Red Lambda markets its products and services in part as a replacement to Arbor's products and services.

55.     Upon information and belief, at the time Ronca joined Red Lambda, Red Lambda had fewer than six customers, all of which were universities or other learning institutions.

**C.     _The Individual Defendants' Employment Agreements_**

56.     Arbor hired Hollyman in or about December 2004 as an SE. During his employment with Arbor, he was promoted to SE Manager. In this role, Hollyman was responsible for, among other things: hiring, managing, supervising, training, and developing the United States regional SE team; running individual or full team meetings with the SE team; working with sales management to create overall sales strategies; meeting customers regularly with sales teams to listen to customer needs, provide additional expertise, and present roadmaps; presenting Arbor's product features, operation, support services and outlining the resulting value

propositions to customers; developing short and long term development plans for each team

member; performing annual reviews for each team member and providing salary

recommendations; providing management with guidance on budgetary and training

requirements; consolidating and prioritizing product feature requests; and attending quarterly

field reviews and quarterly business reviews.

57.    Arbor hired Ronca in or about October 2005 as the sales director for South

America.  During his employment with Arbor, he was promoted to Vice President of America

Sales.  In this role, Ronca was responsible for, among other things:  strengthening existing

customer relationships; growing sales revenue profitably; managing and developing Arbor's

sales organization in the United States, Canada, and Latin America; developing direct sales

strategy; achieving quarterly bookings objectives through aggressive pipeline management;

producing revenue reports, forecasting, budgets, account review, opportunity review, and agreed

strategies and actions to accomplish the sales objectives for senior management; working with

marketing on lead generation, public relations, and industry events; and working with product

management to identify new features and functionality to retain Arbor's competitive advantage.

58.    Arbor hired Scanlon in or about October 2005 as a Consulting Engineer.  During

his employment with Arbor, he was promoted to Senior Product Manager and then Solutions

Architect.  In the role of Solutions Architect, Scanlon was responsible for, among other things:

driving sales demand of Arbor solutions; working with sales and SE leadership to drive product

evolution; defining areas of market opportunity for increased sales success; working with the

sales engineering team to architect technical and business solutions to customer challenges based

on Arbor's product lines; data mining and analysis of internet and security trends; conducting

security research; and driving data collection and analysis projects internally at Arbor.  Scanlon

was one of the technical and business leaders within the global sales organization.

> **i.      The Danaher Agreement**

59.      Ronca and Scanlon signed the Danaher Corporation[1] and Its Affiliated Entities

Agreement Regarding Solicitation and Protection of Proprietary Interests (the "Danaher

Agreement") in 2010, when Danaher acquired Arbor.  Hollyman signed the Danaher Agreement

in 2011.  As consideration therefore,  Ronca, Scanlon, and Hollyman received additional

benefits, including stock options.  True and accurate copies of the executed Danaher Agreements

are attached hereto as Exhibit A.

60.      The Danaher Agreement included several covenants regarding Ronca's,

Scanlon's, and Hollyman's duties of loyalty to Arbor.  Specifically, Section 1(b) of the Danaher

Agreement, provides, in part:

> At all times during and after the termination of my employment
> with the Company, I will not, without the Company's prior written
> permission, directly or indirectly for any purpose other than
> performance of my duties for the Company, utilize or disclose to
> anyone outside of the Company any Confidential Information, or
> any information received by the Company in confidence from or
> about third parties, as long as such matters remain trade secrets or
> confidential.

Section 1(a) of the Danaher Agreement defines confidential information as, among other things,

Arbor's customer and supplier identification and contacts, information about customers, contract

terms, business relationships, business and customer strategy, pricing information, and product

information.

---

[1] Arbor is a wholly-owned indirect subsidiary of Danaher.  The Danaher Agreement defines the term "Company" as "Danaher Corporation including its subsidiaries and/or affiliates."

61.     Section 2 of the Danaher Agreement prohibits the signatories thereto from retaining all tangible materials (including electronically stored information) following the termination of their employment with Arbor.  This section further provides that the signatories thereto will not copy or remove any property or information belonging to Arbor or its customers, and will not provide any such materials to any "competitor of or entity seeking to compete with" Arbor.

62.     Section 6(a) of the Danaher Agreement provides, in part, that during their employment with Arbor and for a twelve month period thereafter, the signatories thereto would not:

> directly or indirectly, on behalf of myself or any other person, company or entity, solicit or participate in soliciting any person, company or entity to purchase or contract for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company, if that person, company or entity was a customer or potential customer of the Company for such products or services with which I had direct contact or about which I learned Confidential Information related to such products or services at any time during the 24 months preceding the termination of my employment or relationship with the Company.

63.     Section 6(b) of the Danaher Agreement provides, in part, that during their employment with Arbor and for a twelve month period thereafter, the signatories thereto would not:

> directly or indirectly, on behalf of myself or any other person, company or entity, offer, provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by the Company to any person, company or entity which was a customer or potential customer of the Company for such products or services with which I had direct contact regarding such products or services at any time during the 24 months preceding the termination of my employment or relationship with the Company.

64.     Section 6(c) of the Danaher Agreement provides, in part, that during their
employment with Arbor and for a twelve month period thereafter, the signatories thereto would
not:

> directly or indirectly, on behalf of myself or any other person,
> company or entity, participate in the planning, research or
> development of any products or services, competitive with
> products or services of the Company, excluding general industry
> knowledge, for which I had product or service planning, research,
> or development responsibilities during the 24 months preceding the
> termination of my employment or relationship with the Company.

65.     Section 6(d) of the Danaher Agreement provides, in part, that their employment
with Arbor and for a twelve month period thereafter, the signatories thereto would not:

> directly or indirectly (i) raid, hire, solicit, encourage or attempt to
> persuade any employee or independent contractor of the Company,
> or any person who was an employee or independent contractor of
> the Company during the 6 months preceding the termination of my
> employment or relationship with the Company, who possesses or
> had access to Confidential Information of the Company, to leave
> the employ of or terminate a relationship with the Company . . . .

66.     Section 15 of the Danaher Agreement provides, in part, that during and after their
employment with Arbor ended, the signatories thereto would not:

> make any false, disparaging or derogatory statement(s) to any
> media outlet, industry group, financial institution, current or
> former employee, consultant, client or customer of the Company,
> or any other entity or person, which are adverse to the interests,
> products, services or personnel of the Company or its and their
> customers or vendors.

67.     Section 8 of the Danaher Agreement provides, in part, that for a period of five
years following the termination of their employment with Arbor, the signatories thereto would
"affirmatively provide [the Danaher Agreement] to all subsequent employers."

68.     Upon termination of his employment with Arbor, Ronca signed a separation agreement (the "Separation Agreement") by which he reaffirmed his obligations under the Danaher Agreement at Section 5(i) thereto in exchange for, *inter alia*, certain post-termination payments.  A true and accurate copy of the Separation Agreement is attached hereto as Exhibit B.[2]

69.     Section 5(iii) of the Separation Agreement specifically referenced Ronca's contractual obligation not to become employed by any company "which is in competition with [Arbor], with which you would hold a position with responsibilities similar or relevant to that which you had access to during the 24 months preceding the termination of your employment or relationship" with Arbor.

70.     Section 7 of the Separation Agreement provided that as a condition of the severance pay, benefits and other consideration provided therein, Ronca would not "make any false, disparaging or derogatory statements to any . . . current or former employee, consultant, client or customer of the Company . . . ."

**ii.     The Arbor Agreement**

71.     Arbor hired Fleming in or about August 2004 in the position of Consulting Engineer.  Fleming was later promoted to Sales Account Manager.  Fleming was responsible for, among other things: selling Arbor products to large enterprises and service providers across the United States; prospecting and acquisition of new accounts; cultivating and closing new prospects; delivering presentations to prospects and new customers; ensuring customer satisfaction; and achieving quota targets.

---

[2] The amount of post-termination payments in the Separation Agreement has been redacted for confidentiality purposes.

14630535v.10

72.     Arbor hired Shirley in or about November 2004 in the position of Consulting Engineer.  Shirley was later promoted to Sales Manager.  Shirley was responsible for, among other things: developing, maintaining and growing client relationships; direct and indirect sales and sales strategy; initiating sales activities to establish and develop account relationships; providing forecasts, account management documentation, and activity reports providing the basis for sales planning; achieving the allocated revenue quotas; identifying, evaluating, and responding to key business issues of accounts and developing and presenting Arbor's capabilities to potential customers; participating in trade shows and other product events; gathering product enhancements requests and providing formal feedback to the necessary internal contacts; and managing direct sales staff.

73.     Arbor hired McEachin in or about June 2005 in the position of Consulting Engineer.  McEachin's title later changed to SE.  McEachin was later promoted to SE Team Lead.

74.     Arbor hired Neel in or about August 2005 in the position of Consulting Engineer. Neel's title was later changed to SE.

75.     Arbor hired Porter in or about August 2008 in the position of Account Manager. Porter was later promoted to Director of Sales.  Porter was responsible for, among other things: developing, maintaining and growing client relationships; direct and indirect sales and sales strategy; initiating sales activities to establish and develop account relationships; providing forecasts, account management documentation, and activity reports providing the basis for sales planning; achieving the allocated revenue quotas; identifying, evaluating, and responding to key business issues of accounts and developing and presenting Arbor's capabilities to potential customers; participating in trade shows and other product events; gathering product

18

enhancements requests and providing formal feedback to the necessary internal contacts; and managing direct sales staff.

76.     Arbor hired Gill in or about October 2009 in the position of Senior Resident Engineer.  Gill was later promoted to SE.

77.     Arbor hired Henkart in or about January 2009 in the position of SE.

78.     The SEs (including McEachin, Neel, Gill, and Henkart) were responsible for providing engineering and technical sales support and account management, including but not limited to:

    (a)    Conducting sales presentations and demos;

    (b)    Providing sales call follow-up and proactive account management with customers to close deals (including keeping account information current on the ASP, attending all sales, sales engineering, and product management meetings);

    (c)    Responding to RFP/RFI/RFQs in coordination with sales account managers;

    (d)    Managing and performing customer technical evaluations of Arbor's products;

    (e)    Providing detailed and timely customer product feedback and feature requests;

    (f)    Leading technical discussions at tradeshows and joint selling opportunities;

    (g)    Creating and recommending specific deployment solutions of Arbor products for customers;

    (h)    Performing and managing product implementations at customer locations in close coordination with Arbor operations/deployment team;

    (i)    Performing technical product and system administration and user training for customers; and

    (j)    Troubleshooting and resolving product issues discovered during the implementation process.

79.     Typically, Arbor employees operated in teams of one salesperson and one SE. The salespeople set the sales strategy, initiated customer engagement, maintained customer relationships, managed opportunities, quoted solutions, and closed deals.   The SEs were responsible for supporting marketing programs, product presentations, demonstrations, RFI/RFP responses, proof of concept trials, technical Q&A, technical proposals, return on investment ("ROI") creation, presenting best practices, product implementation and management of technical contacts in the account.  This "team" model ensured that customers were being served by both talented salespeople and SEs to create a seamless experience based on both sales and technical acumen to best serve the customer's needs.

80.     Many of the Individual Defendants worked as a part of such teams, as follows: Porter (salesperson) and Henkart (SE); Shirley (salesperson) and McEachin (SE); and Neel (SE), Gill (SE), and Fleming (salesperson).

81.     Shirley, Fleming, Gill, Neel, McEachin, Porter, and Henkart all signed Employee Confidentiality, Developments and Non-Solicitation Agreements (the "Arbor Agreements") at the commencement of their employment with Arbor.  True and accurate copies of the executed Arbor Agreements are attached hereto as Exhibit C.

82.     The Arbor Agreements provide, in part, that the signatories thereto agree:

> not to disclose directly or indirectly to any unauthorized person or
> entity, and . . . not to make use of, without the Company's prior
> written permission, at any time during or after my employment,
> knowledge which I acquire either before or during my employment
> with the Company respecting the Company's confidential
> information except for and on behalf of the Company, and solely
> within the course and scope of my employment.

83.     The Arbor Agreements further provide, in part, that the signatories thereto agree that during the term of their employment they will not "make, use or permit to be used any

Company Property otherwise than for the benefit of the Company," and that after the termination of their employment, they will not "use any such Company Property and shall not assist any other person in using the same . . . .  Immediately upon the termination of my employment I shall deliver all Company Property in my possession, and all copies thereof, to the Company."

84.     "Company Property" is defined in the Arbor Agreements as, *inter alia*, software programs, software code, and computers.

85.     The Arbor Agreements further provide, in part, for the term of their employment with Arbor and for a period of twelve months thereafter, that the signatories thereto:

> (1) will not, directly or indirectly . . . participate or invest in any business activity anywhere in the United States . . . which develops, manufactures or markets products or performs services which are competitive with or similar to the products or services of the Company, or products or services which the Company has under development or which are the subject of active planning at any time during the term of my work with the Company; (2) will refrain from directly or indirectly . . . soliciting, inducing or influencing any person to leave the employment of the Company; and (3) will refrain from soliciting or encouraging any customer or supplier to terminate or otherwise modify adversely its business relationship with the Company.

**D.      *The Individual Defendants' Departure from Arbor and Solicitation of Arbor Employees and Customers***

86.     While employed by Arbor, Ronca advocated for a more software-based platform for Arbor's products (in contrast to Arbor's appliance-based platform), even proposing a go-to-market strategy he called "Arbor 7."

87.     Arbor ultimately decided not to invest in Arbor 7 because it did not believe that it was the right approach for the company, or that it was in Arbor's interest as opposed to Ronca's.

88.     Ronca was terminated from Arbor on February 4, 2011.

89.     Upon learning of his termination, Ronca became angry and upset.  He threatened to retaliate against Arbor and generally expressed ill will towards Arbor.

21

90.     On February 8, 2011, Ronca asked Arbor's Senior Human Resources Partner, Bonnie Calnan ("Calnan"), if he could keep his Arbor-issued laptop.  Calnan responded that same day that Ronca would have to return his laptop in compliance with Arbor's policies regarding the return of all Arbor property.

91.     Shortly after his termination, Ronca asked the ex-CEO of Arbor, Jack Boyle ("Boyle"), to call Arbor's current CEO, Colin Doherty ("Doherty"), on Ronca's behalf to inquire as to whether Arbor would sell its "Peak Flow X" product (now known as Pravail NSI) to Ronca. Doherty declined this request.

92.     Upon information and belief, Ronca became employed by Red Lambda in or around April of 2011.

93.     On May 11, 2012, Red Lambda issued a press release announcing Ronca's hire. Ronca was quoted in this press release, saying that he had "witnessed enterprise customers and critical infrastructure providers invest millions in appliance-based network security solutions only to fall short of the mark," and touting Red Lambda's software platform-based approach to network security.

94.     Shirley resigned from Arbor on May 13, 2011, and upon information and belief, became employed by Red Lambda immediately.

95.     Fleming resigned from Arbor on May 16, 2011, and upon information and belief, became employed by Red Lambda immediately.

96.     Scanlon resigned from Arbor on October 7, 2011, and upon information and belief, became employed by a non-competitive entity shortly thereafter.  Upon information and belief, Scanlon accepted employment with Red Lambda on or around April 30, 2012.  Arbor

learned of Scanlon's employment with Red Lambda via a press release issued by Red Lambda on April 30, 2012 announcing Scanlon's hire as Vice President of Product Management.

97.     Hollyman resigned from Arbor on February 3, 2012, and upon information and belief, became employed by a non-competitive entity shortly thereafter.  Upon information and belief, Hollyman accepted employment with Red Lambda in or around May 2012.

98.     Porter resigned from Arbor on March 8, 2012, and upon information and belief, became employed by Red Lambda immediately.

99.     Gill resigned from Arbor on March 15, 2012, and upon information and belief, became employed by Red Lambda immediately.

100.    Henkart resigned from Arbor on March 16, 2012, and upon information and belief, became employed by Red Lambda immediately.

101.    McEachin resigned from Arbor on March 30, 2012, and upon information and belief, became employed by Red Lambda immediately.

102.    Neel resigned from Arbor on April 5, 2012, and upon information and belief, became employed by Red Lambda immediately.

103.    When asked, Henkart, Neel, Gill, and McEachin refused to reveal the identity of their new employer.

104.    When Carlos Morales ("Morales"), Arbor's Vice President of Sales Engineering and Operations, told Henkart, Neel, Gill, and McEachin that Arbor's position was that Red Lambda was a competitor, Henkart, Neel, Gill, and McEachin continued to refuse to identify their new employer.  Gill stated that he did not believe Red Lambda was a competitor, but still declined to respond to Morales' query regarding his new employer.

105.    Upon his resignation from Arbor in May of 2011, Shirley told Morales and Doherty that he was going to work for Brocade Communications Systems, Inc. ("Brocade"). However, Shirley was employed by Red Lambda by no later than July 14, 2011.  Upon information and belief, Shirley never worked for Brocade.

106.    In or around the beginning of May 2012 (shortly after he accepted employment with Red Lambda), Scanlon told Morales that he had been instructed not to speak with Arbor once he joined Red Lambda.

107.    At the beginning of October 2011, just before Scanlon left Arbor, Arbor had seventeen SE positions in the United States.  In the following six months, six of those SEs (or over one-third of all such positions) would leave Arbor to eventually join Red Lambda.

108.    Upon information and belief, prior to Ronca's employment with Red Lambda, Red Lambda had only one salesperson on its staff.  Upon information and belief, Red Lambda's current sales force consists primarily of former Arbor employees.

109.    By accepting employment with Red Lambda, a competitor of Arbor, within twelve months of the termination of their employment with Arbor, the Individual Defendants have breached their respective agreements with Arbor.

110.    By virtue of the loss of ten key employees in the span of just fourteen months (and five in less than one month), Arbor has had to expend a great deal of time and money to find and train qualified replacements.  In addition to having spent several thousand dollars on travel and training costs associated therewith, Arbor was forced to devote a great deal of its employees' time and energy to finding and training these new hires, leaving less time to foster its customer relationships and continue working on its products and services.

E.  *Solicitation of Arbor Employees and Customers and Disparagement*

111.    Upon information and belief, within the twelve month period following the termination of his employment with Arbor, Ronca solicited several Arbor employees, including the remaining Individual Defendants, to leave Arbor for Red Lambda.

112.    Upon information and belief, within the twelve month period following the termination of their employment with Arbor, the Individual Defendants solicited Arbor's customers to terminate or modify adversely their business relationship with Arbor.

113.    For example, on June 28, 2011, less than five months after termination of Ronca's employment with Arbor, Henry Yu, an employee of Arbor customer TWT, sent an email copying Ronca and requesting that Red Lambda execute a mutual non-disclosure agreement with TWT.  Ronca responded to this email on July 14, 2011, copying Shirley, who had resigned from Arbor only two months prior.  Shirley and Ronca responded several times in this email chain over the next few days.

114.    On March 28, 2012, less than three weeks after Porter had resigned from Arbor, Yu emailed Porter asking if Porter could get the non-disclosure agreement between TWT and Red Lambda executed.  Yu had been Porter's contact at TWT while Porter was employed by Arbor.

115.    On April 4, 2012, less than four weeks after resigning from Arbor, Porter emailed John Kelly, Arbor's key contact at Comcast (an Arbor customer), on behalf of Red Lambda, to discuss a "team dinner" with Rob Bird (Red Lambda's president), Ronca, Porter, and Henkart.  Henkart was copied on this email at his Red Lambda email address.

116.    The aforementioned emails were mistakenly sent to Porter's former Arbor email address on March 28, 2012 and April 9, 2012.

14630535v.10

117.    Neustar, Inc. ("Neustar"), an Arbor customer, has informed Arbor that Red Lambda conducted a trial of its solutions at Neustar's offices.

118.    Upon information and belief, Red Lambda has also conducted trials for AT&T and Verizon, two key Arbor customers.

119.    Upon information and belief, Ronca has made disparaging comments about Arbor to an officer of one of Arbor's customers, VeriSign, prompting the officer to question Doherty about alleged outdated technology and loss of Arbor's staff in or around May of 2012.

120.    In or around May 2012, Doherty called Ronca to demand that Ronca stop disparaging Arbor.  Ronca denied that he had disparaged Arbor.

121.    AT&T has informed Arbor that it is researching Arbor's competitors due to concerns about Arbor's ability to meet its needs. Upon information and belief, these alleged concerns are the result of disparagement from one or more of the Individual Defendants.

122.    Upon information and belief, Red Lambda has knowingly participated in or encouraged Ronca's solicitation of Arbor employees and the Individual Defendants' solicitation of Arbor customers in violation of their agreements with Arbor.

**F.    _Gill's and McEachin's Wrongful, Unauthorized Use of Arbor's Computers_**

123.    Upon termination of their employment with Arbor, each of the Individual Defendants participated in exit interviews, during which an Arbor representative reminded them of their obligation to return Arbor assets, including computers.

124.    On April 18, 2012, counsel for Arbor sent cease and desist letters to the Individual Defendants, with the exception of Scanlon and Hollyman (who, upon leaving Arbor, first joined a non-competitive entity and only joined Red Lambda after the cease and desist letters were mailed),  which alerted them to the possibility of litigation and specifically referenced their

"legal obligation to immediately preserve all data and documents that may be relevant to the issues raised herein."  True and accurate copies of these letters are attached hereto as Exhibit D.

125.    Also on April 18, 2012, counsel for Arbor sent a letter to Bahram Yusefzadeh, Red Lambda's Executive Chairman and CEO, referencing the Arbor Agreements and Ronca's Danaher Agreement and the Individual Defendants' continuing obligations thereunder, and alerting Red Lambda to the possibility of litigation.  This letter attached the executed Arbor Agreements and Ronca's Danaher Agreement.  A true and accurate copy of this letter is attached hereto as Exhibit E.

126.    McEachin returned his company computer to Arbor on May 10, 2012, nearly six weeks after his exit interview and over three weeks after the cease and desist letter was sent to him.

127.    A forensic analysis conducted by Arbor after it received McEachin's computer revealed that the computer had been completely "wiped clean," such that no data could be recovered from it.

128.    Upon information and belief, McEachin conducted or directed the permanent deletion of all data from his computer in an effort to hide the trail of his and the other Defendants' activities.

129.    On May 17 and May 18, 2012, Arbor representatives contacted Gill via Skype to inquire about the return of his Arbor computer.  Gill ignored both these queries.

130.    On May 23, 2012, Arbor sent Gill a letter again demanding the return of his Arbor computer.

131.    Gill finally returned his Arbor computer by sending the computer to Arbor's counsel on or around May 31, 2012, over eleven weeks after his exit interview and over six weeks after the cease and desist letter was sent to him.

132.    A forensic analysis conducted by Arbor after it received Gill's computer revealed that the computer had been reformatted on May 4, 2012, well after Gill was put on notice of potential litigation, leaving no data to be analyzed.

133.    Upon information and belief, Gill conducted or directed the reformatting of his computer and resulting permanent deletion of all data from his computer in an effort to hide the trail of his and the other Defendants' activities.

134.    Arbor has incurred more than $5,000 in costs in responding to Gill's and McEachin's computer offenses and in engaging a computer forensics firm to analyze and assess the extent of their wrongful taking of information from Arbor's computer systems and deletion of information or files from Arbor's computers.

## COUNT I
### Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*
### Against Gill and McEachin

135.    Plaintiff repeats and realleges Paragraphs 1 –134 above, and incorporates them as if fully set forth herein.

136.    Arbor's computer systems comprise a protected computer that is used across state lines in interstate and/or foreign commerce and communication.

137.    The Arbor Agreements provide that the signatories thereto "shall not, after the termination of [their] employment, use any . . . Company Property and shall not assist any other person in using the same."

138.    By the conduct described above, including their permanent deletion of files from Arbor's computers,  Gill and McEachin exceeded their authorized access and/or accessed Arbor's computer systems without authorization for their own benefit and, upon information and belief, the benefit of their new employer, Red Lambda.

139.    Gill's and McEachin's unauthorized actions in permanently deleting files from Arbor's computers caused both damage and loss to Arbor.

140.    Through the above-described actions, Gill and McEachin have:

    A.    knowingly caused the transmission of a program, information, code, or command, intentionally causing damage without authorization to a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A); and/or

    B.    intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage in violation of 18 U.S.C. § 1030(a)(5)(C).

141.    Arbor has suffered losses in excess of $5,000.00 in a one-year period, including, without limitation, the costs of engaging a computer forensics firm to respond to Gill's and McEachin's offenses and to analyze and assess the extent of their wrongful taking of information from Arbor's computers, as well as their attempts to delete any trail of their misconduct.

142.    As a result of Gill's and McEachin's wrongdoings, Arbor has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury, for which there is no adequate remedy at law to compensate.

143.    By reason of the foregoing, Arbor requires injunctive relief.  Unless injunctive relief is granted, Arbor will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Arbor has been damaged in an amount to be determined at trial.

14630535v.10

## COUNT II
### Breach of Contract Against Individual Defendants

144.     Plaintiff repeats and realleges Paragraphs 1 – 143 above, and incorporates them as if fully set forth herein.

145.     Arbor and Ronca entered into a contract, the Danaher Agreement, during Ronca's employment with Arbor.

146.     Ronca reaffirmed his obligations to Arbor by virtue of signing the Separation Agreement.

147.     Arbor and Scanlon entered into a contract, the Danaher Agreement, during Scanlon's employment with Arbor.

148.     Arbor and Hollyman entered into a contract, the Danaher Agreement, during Hollyman's employment with Arbor.

149.     Arbor and the remaining Individual Defendants entered into contracts, the Arbor Agreements, during their employment with Arbor.

150.     The covenants contained in the Danaher Agreements and the Arbor Agreements remained in full force and effect through the Individual Defendants' departure from Arbor, and the Individual Defendants, for good consideration, remained obligated to comply with those covenants.

151.     Arbor satisfied all of its obligations under the terms and conditions of the Danaher Agreements and the Arbor Agreements.

152.     By the acts described above, Ronca, Scanlon, and Hollyman have breached their Danaher Agreements by accepting employment with Red Lambda during the twelve month period following the termination of their employment with Arbor.

153.    Ronca has also breached his Danaher Agreement by soliciting or encouraging Arbor's customers or potential customers to purchase products or services offered by Red Lambda during the twelve month period following the termination of his employment with Arbor.  Upon information and belief, Ronca has also breached the Danaher Agreement by soliciting Arbor's employees for Red Lambda during the twelve month period following the termination of his employment with Arbor and making disparaging remarks about Arbor to customers of Arbor.

154.    By the acts described above, the remaining Individual Defendants have breached their Arbor Agreements by joining Red Lambda, a competitor of Arbor, within twelve months of their resignation from Arbor.

155.    Shirley, Porter, and Henkart have further breached their Arbor Agreements by soliciting or encouraging Arbor's customers or potential customers to terminate or modify their business relationship with Arbor during the twelve month period following the termination of their employment with Arbor.  Upon information and belief, the remaining Individual Defendants have also breached their respective agreements by soliciting or encouraging Arbor's customers or potential customers to terminate or modify their business relationship with Arbor during the twelve month period following the termination of their employment with Arbor.

156.    Gill and McEachin have also breached their Arbor Agreements by (i) failing to return Arbor property, namely Arbor computers, immediately upon termination of their employment, and (ii) destroying, modifying, or deleting relevant evidence prior to returning their computers to Arbor.

157.    As a result of the Individual Defendants' breaches of contract, Arbor has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with

31

further substantial and irreparable injury due to the loss of its key personnel, trade secrets and/or confidential information, for which there is no adequate remedy at law to compensate.

158.    By reason of the foregoing, Arbor requires injunctive relief.  Unless injunctive relief is granted, Arbor will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Arbor has been damaged in an amount to be determined at trial.

## COUNT III
**Intentional Interference With Contractual Relations Against Ronca**

159.    Plaintiff repeats and realleges Paragraphs 1 – 158 above, and incorporates them as if fully set forth herein.

160.    By the acts described above, Ronca has interfered with Arbor's contractual relationships with the remaining Individual Defendants.

161.     Ronca knew or should have known that the remaining Individual Defendants' acceptance of employment with Red Lambda would constitute violations of their respective agreements with Arbor, but upon information and belief, solicited them to join Red Lambda anyway.

162.    Ronca knew or should have known that the remaining Individual Defendants' solicitation of Arbor customers within twelve months of their departure from Arbor would constitute violations of their respective agreements with Arbor, but upon information and belief, encouraged this solicitation anyway.

163.    By the acts described above, Ronca had an improper motive and used improper means in interfering with Arbor's contractual and/or advantageous business relations without lawful justification or legitimate reason for this interference with these contractual and/or advantageous business relationships.

164.    As a direct and proximate result of Ronca's actions described above, the remaining Individual Defendants have been induced to terminate their employment with Arbor.

165.    As a direct and proximate result of Ronca's actions described above, the remaining Individual Defendants have been induced to breach their respective agreements with Arbor.

166.    As a direct and proximate result of Ronca's actions described above, Arbor has suffered and continues to suffer irreparable harm and monetary damages.

167.    By reason of the foregoing, Arbor requires injunctive relief.  Unless injunctive relief is granted, Arbor will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Arbor has been damaged in an amount to be determined at trial.

### COUNT IV
**Intentional Interference With Contractual Relations Against Red Lambda**

168.    Plaintiff repeats and realleges Paragraphs 1 – 167 above, and incorporates them as if fully set forth herein.

169.    By the acts described above, Red Lambda has interfered with Arbor's contractual relationships with the Individual Defendants.

170.     Red Lambda knew or should have known that the Individual Defendants' acceptance of employment with Red Lambda would constitute breaches of the Danaher Agreements and the Arbor Agreements, but hired them anyway.

171.     Red Lambda knew or should have known that the Individual Defendants' solicitation of Arbor customers within twelve months of their departure from Arbor would constitute violations of the Danaher Agreements and Arbor Agreements, but upon information and belief, encouraged this solicitation anyway.

14630535v.10

172.     By the acts described above, Red Lambda had an improper motive and used improper means in interfering with Arbor's contractual and/or advantageous business relations without lawful justification or legitimate reason for this interference with these contractual and/or advantageous business relationships.

173.     As a direct and proximate result of Red Lambda's actions described above, the Individual Defendants have been induced to terminate their employment with Arbor.

174.     As a direct and proximate result of Red Lambda's actions described above, the Individual Defendants have been induced to breach the Danaher Agreements and Arbor Agreements with Arbor.

175.     As a direct and proximate result of Red Lambda's actions described above, Arbor has suffered and continues to suffer irreparable harm and monetary damages.

176.     By reason of the foregoing, Arbor requires injunctive relief.  Unless injunctive relief is granted, Arbor will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Arbor has been damaged in an amount to be determined at trial.

## COUNT V
### Violation of Mass. Gen. Laws c. 93A, §§ 2 and 11 Against Red Lambda

177.     Plaintiff repeats and realleges Paragraphs 1 – 176 above, and incorporates them as if fully set forth herein.

178.     Arbor is a "person" and engages in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, § 1.  Red Lambda is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

179.     The conduct constituting violations of M.G.L. c. 93A occurred primarily and substantially in Massachusetts.

180.     Red Lambda's activities as set forth above constitute willful and knowing violations of M.G.L. c. 93A, §§ 2 and 11.

181.     Specifically, upon information and belief, Red Lambda aided and abetted the Individual Defendants' breaches of their respective agreements with Arbor and thereby tortiously interfered with Arbor's contractual relationships.

182.     As a result of Red Lambda's violations of M.G.L. c. 93A, §§ 2 and 11, Arbor has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

183.     By reason of the foregoing, Arbor requires injunctive relief.  Unless injunctive relief is granted, Arbor will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Arbor has been damaged in an amount to be determined at trial.

## REQUESTED RELIEF

**WHEREFORE,** Arbor prays that this Court:

A.     Enter an order granting the relief set forth in Arbor's proposed Order attached to its Motion for Preliminary Injunction;

B.     Enter an Order granting a permanent injunction to the same effect as the proposed preliminary injunction;

C.     Enter judgment in Arbor's favor and against Defendants jointly and severally, where applicable, for all damages that may be calculated that Arbor may recover as a result of their misconduct, including but not limited to disgorgement of monies received by Ronca under the Separation Agreement, plus interest;

D.     Award attorneys' fees and costs as allowed by law;

E.      Award treble damages pursuant to Mass. Gen. Laws ch. 93A; and

F.      Grant such other and further relief as may be just and proper.


**JURY TRIAL DEMAND**

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES AND COUNTS SO TRIABLE.**

Respectfully submitted,

ARBOR NETWORKS, INC.

By its attorneys,


 /s/ *Dawn Mertineit*
Katherine E. Perrelli (BBO #549820)
Dawn Mertineit (BBO #669988)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, Massachusetts  02210
Dated:  July 19, 2012                           (617) 946-4800

14630535v.10

<u>VERIFICATION</u>

I, Colin Doherty, hereby make oath and affirm that I have personal knowledge of allegations of the within Verified Complaint, and affirm that said allegations are true to the best of my knowledge and belief, except as to those allegations made upon information and belief, and as to said allegations, I believe them to be true.

Signed under the pains and penalties of perjury this 19th day of July, 2012.

_____*/s/ Colin Doherty*_____
Colin Doherty
President
Arbor Networks, Inc.

37