UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ARBOR NETWORKS, INC.,                   )
                                        )
            Plaintiff,                  )
                                        )        C.A. No. _____
v.                                      )
                                        )
WILLIAM E. RONCA III, RICHARD SHIRLEY,  )
DOUGLAS FLEMING, JAMES GILL, JAMES      )
NEEL, JASON MCEACHIN, MICHAEL L.        )
PORTER, ANDREW HENKART, PAUL            )
SCANLON, MICHAEL HOLLYMAN, and          )
RED LAMBDA, INC.,                       )
                                        )
            Defendants.                 )
_____)


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND MOTION FOR A PRELIMINARY INJUNCTION**

# <u>INTRODUCTION</u>

In conjunction with the Verified Complaint submitted contemporaneously herewith, the Plaintiff, Arbor Networks, Inc. ("Arbor" or "Plaintiff"), seeks injunctive relief against William E. Ronca, III ("Ronca"), Richard Shirley ("Shirley"), Douglas Fleming ("Fleming"), James Gill ("Gill"), James Neel ("Neel"), Jason McEachin ("McEachin"), Michael L. Porter ("Porter"), Andrew Henkart ("Henkart"), Paul Scanlon ("Scanlon"), Michael Hollyman ("Hollyman") (collectively, the "Individual Defendants"), and Red Lambda, Inc. ("Red Lambda") (collectively with Individual Defendants, "Defendants").  A motion for expedited discovery is being filed simultaneously herewith, and Arbor will supplement this memorandum with additional facts as they become available.

Even on the current factual record, Arbor respectfully submits that there is a substantial likelihood that Arbor will succeed on the merits of its claims against Defendants.[1]  The evidence establishes that the Individual Defendants breached their contractual obligations by accepting employment with Red Lambda, an Arbor competitor, and soliciting Arbor's customers within twelve months of the termination of their employment with Arbor.[2]  Upon information and belief, Defendant Ronca further breached his agreement with Arbor by soliciting key Arbor employees to join Red Lambda, and by disparaging Arbor to its customers.  Ronca's actions in encouraging the Individual Defendants to breach their agreements also constitutes intentional

---

[1] Where a verified complaint and accompanying affidavits establish the existence of non-compete agreements and background circumstances, issuance of preliminary injunction is proper ("One would not expect [the plaintiff] to possess extensive direct personal knowledge of [violations of covenants].  Moreover, the purpose of the injunction is to prevent whatever future violations are likely to occur.").  *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 493-94 (Mass. App. Ct. 1986).

[2] Scanlon, Porter, Gill, Henkart, McEachin, Neel, and Hollyman are all still under restriction.  While Ronca's, Shirley's, and Fleming's restrictive covenants relating to non-solicitation and non-competition have lapsed, these defendants are still liable for damages caused by their breaches.  Further, their obligations not to disclose confidential Arbor information, as well as Scanlon's and Ronca's obligations not to disparage Arbor, remain in place.

interference with Arbor's contractual relations.  Defendants Gill and McEachin engaged in egregious conduct by permanently deleting files from their Arbor-issued computers, thereby spoliating evidence and violating the Computer Fraud and Abuse Act.  Because Red Lambda, upon information and belief, knowingly induced the Individual Defendants to breach their agreements with Arbor, Red Lambda is liable for intentional interference with contractual relations and for unfair and deceptive acts under Massachusetts General Laws Chapter 93A. Accordingly, Arbor is substantially likely to succeed on all of its claims against Defendants.

Arbor respectfully submits that the Court must grant the requested injunctive relief to prevent Arbor from suffering irreparable harm caused by Defendants' blatant acts of misconduct. The balance of harms tips in favor of Arbor, and the requested injunctive relief will not adversely affect the public interest in any manner.

## STATEMENT OF FACTS

### A.    *Arbor's Business and Confidential Information*

Arbor is a global provider of distributed denial of service ("DDoS") attack protection, network security, and visibility solutions.  It performs detection and mitigation of security threats for both enterprise businesses (typically, large- and medium-sized enterprises such as banks) and carrier businesses (primarily, internet service providers).  Verified Complaint ("Complaint"), ¶ 22.  Arbor has two main product lines, the Pravail product line (including Pravail NSI and Pravail APS), sold primarily to enterprise businesses, and Arbor Peakflow SP ("Peakflow"), sold primarily to carrier businesses.  *Id.*, ¶ 23.  *See also* Affidavit of Carlos Morales in Support of Plaintiff's Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("Morales Aff."), filed simultaneously herewith, at ¶¶ 4-9.

Arbor maintains as confidential certain highly valuable proprietary business information. *Id.*, ¶ 28. For example, Arbor stores its confidential customer information in a secure proprietary database, the Arbor Sales Portal ("ASP"), which allows authorized users to view, create, and/or modify a wide variety of customer information. *See* Affidavit of Chris Conry in Support of Plaintiff's Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("Conry Aff."), filed simultaneously herewith, at ¶¶ 5- 6. This information, which is not available to the public and is considered a closely-guarded trade secret by Arbor, is only accessible to management and sales-related employees via a secured virtual private network ("VPN") connection. *Id.*, ¶¶ 7- 8, 10. The Individual Defendants all had access to the ASP during their employment with Arbor. *Id.*, ¶ 9. Arbor has invested millions of dollars into building the ASP. Complaint, ¶ 29.

Arbor also keeps confidential source code in an extremely restricted database called "SVN," to which Arbor's technical specialists, known in Arbor parlance as sales engineers or "SEs," had access. Conry Aff., ¶ 11. The SEs also have access to customization known as "program scripts" that are contained at the customer site and on the particular SE's local hard drive, which may not be shared with anyone outside Arbor. *Id.,* ¶ 12.

The information contained in these databases is integral to Arbor's efforts at developing and maintaining its goodwill and, consequently, constitutes a trade secret and/or proprietary, confidential information. Complaint, ¶ 36. Because this information is so important to its business, in addition to restricting access thereto, Arbor requires employees with access to execute employment agreements prohibiting its disclosure. *Id.*, ¶ 37. Arbor also requires all employees (including the Individual Defendants) to sign an Information Security Program

handbook (the "ISP Handbook") that lays out Arbor's various policies and procedures related to the security and protection of Arbor's confidential information. Conry Aff., ¶¶ 13-17, 19.

Arbor has invested heavily in developing its goodwill with its clients, and has spent considerable amounts of money over the years to enable the Individual Defendants to foster customer relationships, determine customer preferences, and produce better products and services based on the customers' unique needs. Complaint, ¶ 41. Arbor encourages employees to entertain customers, and pays all expenses for customer dinners, sporting events, and other entertainment.[3] *Id.*, ¶ 42. Arbor also conducts yearly customer summits attended by nearly 100 Arbor customers, as well as SEs and salespeople, during which Arbor presents on its roadmaps, solutions, company vision and direction - all funded by Arbor in developing and maintaining relationships and goodwill with its customers.[4] *Id.*, ¶ 43. The Individual Defendants also benefited from Arbor's pre-existing relationships; for example, Porter and Henkart inherited key relationships that Arbor had nurtured for years prior to their employment, including relationships with John Kelly ("Kelly") at Comcast and Henry Yu ("Yu") at tw telecom, inc. ("TWT"). *Id.*, ¶ 44. Virtually all of Ronca's contacts at Arbor were pre-existing relationships that he inherited, and which, upon information and belief, he is now using on Red Lambda's behalf. *Id.*, ¶ 45.

The Individual Defendants, through their employment with Arbor (including their access to the databases described above), gained unique knowledge of Arbor's customers, products, and business strategy which may be used to gain a competitive advantage against Arbor. *Id.*, ¶ 46. The Individual Defendants thus had unique knowledge of what Arbor's products could (and could not) do, as well as Arbor's development track for years to come. *Id.*

---

[3] Arbor reimburses such expenses to the extent they conform to the gift and entertainment policy of Arbor's indirect parent corporation, Danaher Corporation ("Danaher").

[4] These summits are confidential, and all customer attendees must have a confidentiality agreement in place with Arbor (or for prospective customers, must execute one for purposes of attending the summit) in order to participate.

**B.    _Red Lambda Is A Competitor Of Arbor_**

Red Lambda is a competitor of Arbor; like Arbor, it performs detection and mitigation of security threats.  *Id.*, ¶ 47.  Red Lambda's products purport to provide complete security visibility into the customer base of Red Lambda's clients by gathering information about data flowing into the network and analyzing potential threats.  *Id.*  For example, its MetaGrid Anomaly Detection product "provides organizations insight into their entire environment, discovering unusual patterns, events, rates and timelines that in isolation would be lost in an archived log file . . . [and] *isolates and highlights anomalies* in any system on the network, creating a Zero Event security posture for recognition of advanced persistent threats as they evolve."[5]  *Id.*, ¶ 48 (emphasis added).  Red Lambda's website even draws the comparison between its products and Arbor's; in a press release, Red Lambda noted Ronca's previous work with Arbor, "a pioneer in denial-of-service attack prevention and *network-based anomaly detection*."[6] (emphasis added).  *Id.*, ¶ 50.  Red Lambda's products have a very similar value proposition as Arbor's products:  providing visibility into their customers' networks, including potential threats.  *Id.*, ¶ 51.  Both Pravail NSI and Red Lambda's products take an anomaly detection approach to try and discover events that are happening on a customer's internal network.  *Id.*  While Red Lambda's products may be implemented in a manner that differs from Arbor's, both companies' products seek to solve the same problem and the end results are similar - tracking down and presenting undesirable behavior of hosts on the network.  *Id.*  Additionally, the companies' products are competitive from a budgetary perspective, in that enterprises will likely choose a single solution to buy at any time in this space.  *Id.*, ¶ 52.  Upon information and

---

[5] *See* http://www.redlambda.com/products/metagrid-analytics/anomaly-detection/, a copy of which is attached to the Mertineit Aff. as Exhibit 2.

[6] *See* http://www.redlambda.com/press-release/william-e-ronca-iii-named-evp-of-global-sales-marketing-and-business-development-for-red-lambda/, a copy of which is attached to the Mertineit Aff. as Exhibit 3.

belief, Red Lambda targets the same customer base as Arbor and markets its products and services in part as a replacement to Arbor's. *Id.*, ¶¶ 53-54.

## C.    *The Individual Defendants' Employment Agreements*

### 1.    *Ronca (The "Pied Piper"), Scanlon, and Hollyman*

Arbor hired Hollyman in or around December 2004; he was eventually promoted to SE Manager. *Id.*, ¶ 56. Arbor hired Ronca in or about October 2005; he was eventually promoted to Vice President of America Sales. *Id.*, ¶ 57. Arbor hired Scanlon in or about October 2005; he was eventually promoted to Senior Solutions Architect. *Id.*, ¶ 58. Ronca and Scanlon signed the Danaher Corporation[7] and Its Affiliated Entities Agreement Regarding Solicitation and Protection of Proprietary Interests (the "Danaher Agreement") in 2010, and Hollyman signed the Danaher Agreement in 2011. *Id.*, ¶ 59 (attaching copies as Exhibit A). As consideration therefore, Ronca, Scanlon, and Hollyman received additional benefits, including stock options. *Id.*

Section 1(b) of the Danaher Agreement, provides, in part:

> At all times during and after the termination of my employment with the Company, I will not, without the Company's prior written permission, directly or indirectly . . . utilize or disclose to anyone outside of the Company any Confidential Information . . . as long as such matters remain trade secrets or confidential.

*Id.*, ¶ 60. Section 1(a) of the Danaher Agreement defines confidential information as, among other things, Arbor's customer identification and contacts, contract terms, business relationships, business and customer strategy, pricing information, and product information. *Id.*

Section 2 of the Danaher Agreement prohibits the signatories thereto from retaining all tangible materials (including electronically stored information) following the termination of their

---

[7] Arbor is a wholly-owned indirect subsidiary of Danaher Corporation. The Danaher Agreement defines the term "Company" as "Danaher Corporation including its subsidiaries and/or affiliates."

employment with Arbor. *Id.*, ¶ 61. This section further provides that the signatories thereto will not copy or remove any property or information belonging to Arbor or its customers, and will not provide any such materials to any "competitor of or entity seeking to compete with" Arbor. *Id.*

Section 6(a) of the Danaher Agreement provides, in part, that during their employment with Arbor and for a twelve month period thereafter, the signatories thereto would not:

> directly or indirectly . . solicit or participate in soliciting any person, company or entity to purchase or contract for products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by [Arbor], if that person, company or entity was a customer or potential customer of [Arbor] for such products or services with which I had direct contact or about which I learned Confidential Information related to such products or services at any time during the 24 months preceding the termination of my employment or relationship with [Arbor].

*Id.*, ¶ 65. Section 6(b) of the Danaher Agreement provides, in part, that during their employment with Arbor and for a twelve month period thereafter, the signatories thereto would not:

> directly or indirectly . . . provide or sell or participate in offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by or distributed by [Arbor] to any person, company or entity which was a customer or potential customer of [Arbor] for such products or services with which I had direct contact regarding such products or services at any time during the 24 months preceding the termination of my employment or relationship with [Arbor].

*Id.*, ¶ 63. Section 6(c) of the Danaher Agreement provides, in part, that during their employment with Arbor and for a twelve month period thereafter, the signatories thereto would not:

> directly or indirectly . . . participate in the planning, research or development of any products or services, competitive with products or services of [Arbor] . . . for which I had product or service planning, research, or development responsibilities during the 24 months preceding the termination of my employment or relationship with [Arbor].

*Id.*, ¶ 64. Section 6(d) of the Danaher Agreement provides, in part, that during their employment with Arbor and for a twelve month period thereafter, the signatories thereto would not:

directly or indirectly (i) raid, hire, solicit, encourage or attempt to persuade any employee . . . of [Arbor], or any person who was an employee . . . of [Arbor] during the 6 months preceding the termination of my employment or relationship with [Arbor], who possesses or had access to Confidential Information of Arbor, to leave the employ of or terminate a relationship with Arbor . . . .

*Id.*, ¶ 65. Section 15 of the Danaher Agreement provides, in part, that during and after their employment with Arbor ended, the signatories thereto would not:

make any false, disparaging or derogatory statement(s) to any . . . current or former employee, consultant, client or customer of [Arbor], or any other entity or person, which are adverse to the interests, products, services or personnel of [Arbor] or its and their customers or vendors.

*Id.*, ¶ 66. Finally, Section 8 of the Danaher Agreement provides, in part, that for a period of five years following the termination of their employment with Arbor, the signatories thereto would "affirmatively provide [the Danaher Agreement] to all subsequent employers." *Id.*, ¶ 67.

Upon his termination, Ronca signed a separation agreement (the "Separation Agreement"), by which he reaffirmed his obligations under the Danaher Agreement, including his obligations not to join a competitive entity and not to disparage Arbor. *Id.*, ¶¶ 68-70 (attaching a copy as Exhibit B).

### 2. *The Remaining Individual Defendants*

Arbor hired the remaining Individual Defendants between 2004 and 2009. *Id.*, ¶¶ 71-77. Typically, Arbor employees operated in teams of one salesperson and one SE, and many of the Individual Defendants worked as part of such teams, as follows: Porter (salesperson) and Henkart (SE); Shirley (salesperson) and McEachin (SE); and Neel (SE), Gill (SE), and Fleming (salesperson). *Id.*, ¶¶ 79-80. Shirley, Fleming, Gill, Neel, McEachin, Porter, and Henkart all signed Employee Confidentiality, Developments and Non-Solicitation Agreements (the "Arbor

Agreements") when they were hired by Arbor.  *Id.*, ¶ 81 (attaching copies as Exhibit C).  The

Arbor Agreements provide, in part, that the signatories thereto agree:

> not to disclose directly or indirectly to any unauthorized person or entity, and . . . not to make use of . . . at any time during or after my employment, knowledge which I acquire either before or during my employment with [Arbor] respecting [Arbor's] confidential information . . .

*Id.*, ¶ 82.  The Arbor Agreements further provide, in part, that the signatories thereto agree that

during the term of their employment they will not "make, use or permit to be used any [Arbor]

Property otherwise than for the benefit of [Arbor]," and that after the termination of their

employment, they will not "use any such [Arbor] Property and shall not assist any other person

in using the same . . . .  Immediately upon the termination of my employment I shall deliver all

[Arbor] Property in my possession, and all copies thereof, to [Arbor]."  *Id.*, ¶ 83.

The Arbor Agreements further provide, in part, for the term of their employment with

Arbor and for a period of twelve months thereafter, that the signatories thereto:

> (1) will not, directly or indirectly . . . participate or invest in any business activity anywhere in the United States . . . which develops, manufactures or markets products or performs services which are competitive with or similar to the products or services of [Arbor], or products or services which [Arbor] has under development or which are the subject of active planning at any time during the term of my work with [Arbor]; (2) will refrain from directly or indirectly . . . soliciting, inducing or influencing any person to leave the employment of [Arbor]; and (3) will refrain from soliciting or encouraging any customer or supplier to terminate or otherwise modify adversely its business relationship with [Arbor].

*Id.*, ¶ 85.

**D.** **_The Individual Defendants' Departure from Arbor_**

Ronca was terminated on February 4, 2011.  *Id.*, ¶ 88.  Upon learning of his termination,

Ronca became angry and threatened to retaliate against Arbor.  *Id.*, ¶ 89.  Shortly thereafter,

Ronca asked Arbor's ex-CEO to ask the current CEO, Colin Doherty ("Doherty"), if Arbor

would sell its "Peak Flow X" product (now known as Pravail NSI) to Ronca; Doherty declined.

*Id.*, ¶ 91.  Upon information and belief, Ronca became employed by Red Lambda in or around April of 2011.  *Id.*, ¶ 92.  On May 11, 2012, Red Lambda issued a press release announcing Ronca's hire, which quoted Ronca as saying that he had "witnessed enterprise customers and critical infrastructure providers invest millions in appliance-based network security solutions only to fall short of the mark," and touting Red Lambda's software platform-based approach to network security.  *Id.*, ¶ 93.[8]

After Ronca was terminated, a staggering number of his former colleagues left Arbor one by one to work for Red Lambda.  Shirley resigned on May 13, 2011, and just three days later, Fleming resigned.  *Id.*, ¶¶ 94-95.  Scanlon resigned on October 7, 2011, followed by Hollyman on February 3, 2012.[9]  *Id.*, ¶¶ 96-97.  Porter resigned on March 8, 2012; a week later, Gill resigned on March 15, 2012, followed by Henkart the next day.  *Id.*, ¶¶ 98-100.  McEachin resigned just two weeks later on March 30, 2012, and the following week, Neel resigned on April 5, 2012.  *Id.*, ¶¶ 101-102.  Upon information and belief, Ronca solicited the remaining Individual Defendants to leave Arbor within the twelve months following his termination.  *Id.*, ¶ 111.  When asked, Henkart, Neel, Gill, and McEachin refused to identify their new employer, even though they were informed that Arbor considered Red Lambda a competitor.  *Id.*, ¶¶ 103-104.  In fact, Shirley told Arbor that was going to work for Brocade Communications Systems, Inc. ("Brocade"), but became employed by Red Lambda by no later than July 14, 2012, and upon information and belief, was never employed by Brocade.  *Id.*, ¶ 105.  Each of the Individual Defendants accepted employment with Red Lambda within twelve months of the termination of their employment with Arbor, in violation of their respective agreements with Arbor.  *Id.*, ¶¶ 92,

<hr>

[8] *See* http://www.businesswire.com/news/home/20110511006452/en/Red-Lambda-Hires-Network-Security-Veteran-William, a copy of which is attached to the Mertineit Aff. as Exhibit 4.

[9] Scanlon and Hollyman first joined a non-competitive entity, but later became employed by Red Lambda in or around April 30, 2012 and May 2012, respectively.  Complaint, ¶¶ 96-97.

94-102. Scanlon, Porter, Gill, Henkart, McEachin, Neel, and Hollyman are all still under restriction. Upon information and belief, Red Lambda's current sales force consists primarily of former Arbor employees. *Id.*, ¶ 108.

Arbor has lost over one-third of its U.S.- based SEs to Red Lambda. *Id.*, ¶ 107. By virtue of the loss of ten key employees in the span of just fourteen months (and five in less than one month), Arbor has spent a great deal of time and money to find and train qualified replacements. *Id.*, ¶ 110. In addition to having spent thousands of dollars on travel and training costs associated therewith, Arbor has been forced to devote a great deal of its employees' time and energy to finding and training these new hires, leaving less time to foster its customer relationships and continue working on its products and services. *Id.*

E.      **_Solicitation of Arbor Customers and Disparagement_**

Within the twelve month period following the termination of their employment with Arbor, several of the Individual Defendants solicited Arbor's customers. *Id.*, ¶ 112. On June 28, 2011, less than five months after Ronca's termination, Yu sent an email, copying Ronca, requesting that Red Lambda execute a mutual non-disclosure agreement with TWT. *Id.*, ¶ 113. Ronca responded on July 14, 2011, copying Shirley, who had resigned from Arbor only two months prior. *Id.* Shirley and Ronca responded several times in this email chain over the next few days. *Id.* On March 28, 2012, less than three weeks after Porter's resignation, Yu (who was Porter's contact at TWT while Porter was employed by Arbor) forwarded this email chain to Porter asking if Porter could get the non-disclosure agreement between TWT and Red Lambda executed. *Id.*, ¶ 114. On April 4, 2012, less than four weeks after resigning, Porter emailed Kelly, Arbor's key contact at Comcast, on Red Lambda's behalf to discuss a "team dinner" with Rob Bird (Red Lambda's president), Ronca, Porter, and Henkart, copying Henkart. *Id.*, ¶ 115.

Arbor was made aware of these contacts when TWT and Comcast mistakenly sent emails to Porter's old Arbor email address. *Id.*, ¶ 116. Arbor can only assume that discovery will reveal that the Individual Defendants have made other contacts with Arbor customers, which have not been mistakenly shared with Arbor.

Upon information and belief, Red Lambda has conducted trials for Neustar, Inc., AT&T, and Verizon, three key Arbor customers. *Id.*, ¶¶ 117-18. In addition, AT&T has informed Arbor that it is exploring Arbor's competitors due to concerns about Arbor's ability to meet AT&T's needs, which, upon information and belief, are the result of disparagement from one or more of the Individual Defendants. *Id.*, ¶ 121. Upon information and belief, Ronca has also disparaged Arbor to at least one of its customers, VeriSign, prompting a VeriSign officer to question Doherty about alleged outdated technology and loss of Arbor's staff. *Id.*, ¶ 119. Upon information and belief, Red Lambda has knowingly participated in the Individual Defendants' solicitation of Arbor employees and customers or potential customers in violation of their agreements with Arbor. *Id.*, ¶ 122. Arbor respectfully submits that these solicitations and disparaging comments are the tip of the iceberg, and that discovery will reveal many more.

## G.     *Gill's and McEachin's Wrongful, Unauthorized Use of Arbor's Computers*

Upon termination of their employment with Arbor, each of the Individual Defendants participated in exit interviews, during which an Arbor representative reminded them of their obligation to return Arbor assets, including computers. *Id.*, ¶ 123. On April 18, 2012, counsel for Arbor sent cease and desist letters to the Individual Defendants, with the exception of Scanlon and Hollyman, which alerted them to the possibility of litigation and specifically referenced their "legal obligation to immediately preserve all data and documents that may be relevant to the issues raised herein." *Id.*, ¶ 124 (attaching copies as Exhibit D). Also on April 18, 2012, counsel for Arbor sent a letter to Red Lambda's Executive Chairman and CEO,

attaching the agreements and referencing the Individual Defendants' continuing obligations thereunder, and alerting Red Lambda to the possibility of litigation. *Id.*, ¶ 125 (attaching a copy of the letter as Exhibit E).

Despite the aforementioned reminders and in blatant disregard for their contractual obligations, Gill and McEachin, possibly at Red Lambda's behest, deleted relevant data from their Arbor-issued computers. McEachin returned his computer to Arbor on May 10, 2012, nearly six weeks after his exit interview and over three weeks after the cease and desist letter was sent to him. *Id.*, ¶ 126. A forensic analysis conducted by Arbor revealed that the computer had been completely "wiped clean," such that no data could be recovered from it. *Id.*, ¶ 127. In light of this egregious breach of his common law and contractual duties to preserve evidence, Arbor can draw no other conclusion but that McEachin conducted or directed the permanent deletion of all data from his computer in an effort to hide the trail of his and the other Defendants' activities.

Gill's conduct is equally egregious. On May 17 and May 18, 2012, Arbor representatives contacted Gill via Skype to inquire about the return of his Arbor computer, which Gill ignored. *Id.*, ¶ 129. On May 23, 2012, Arbor sent Gill a letter again demanding the return of his computer. *Id.*, ¶ 130. Gill finally returned his computer by sending it to Arbor's counsel on or around May 31, 2012, over eleven weeks after his exit interview and over six weeks after the cease and desist letter was sent to him. *Id.*, ¶ 131. A forensic analysis conducted by Arbor revealed that the computer had been reformatted on May 4, 2012, well after Gill was put on notice of potential litigation, leaving no data to be analyzed. *Id.*, ¶ 132. Gill's actions in reformatting his computer, resulting in the permanent deletion of all relevant files, leads to the unmistakable conclusion that he acted in an effort to hide the trail of his and the other Defendants' activities. As a result of Gill's and McEachin's outrageous actions, Arbor has

incurred more than $5,000 in costs in engaging a computer forensics firm to analyze and assess the extent of their wrongful taking of information from Arbor's computer systems and deletion of information or files from Arbor's computers.  *Id.*, ¶ 134.

## ARGUMENT

"A district court may issue a preliminary injunction only upon considering '(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions…; and (4) the effect (if any) of the court's ruling on the public interest.'"  *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581 (1st Cir. 2001) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996)).[10]  Arbor has met these requirements.

## I.     ARBOR HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS.

While likelihood of success is the touchstone of the preliminary injunction inquiry, *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998), the Court "need not predict the eventual outcome on the merits with absolute assurance."  *Ross-Simons of Warwick*, 102 F.3d at 15 (affirming grant of preliminary injunction in CFAA case).  As explained in detail below, Arbor has a strong likelihood of success on the merits of all of its claims against the Defendants.

### A.     Arbor Has A Strong Likelihood Of Success On The Merits Of Its Claim Against Gill and McEachin For Violation Of The Computer Fraud And Abuse Act (Count I).

The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq. ("CFAA"), provides an employer civil remedy against former employees who delete information from the employer's computer system.  *See The Dedalus Found. v. Banach*, 2009 WL 3398595 (S.D.N.Y. Oct. 16,

---

[10] The standard for obtaining a temporary restraining order is identical.  *Latin Am. Music Co. v. Cardenas Fernandez & Assoc.*, 2 Fed. Appx. 40, 42 n.2 (1st Cir. 2001).

2009).   Under the CFAA, a plaintiff may recover compensatory damages and injunctive or other

equitable relief.  18 U.S.C. § 1030(g); *see EF Cultural*, 274 F.3d at 581 (affirming grant of

preliminary injunction).  The CFAA provides for a civil action if an individual causes "a loss to 1

or more persons during any 1-year period… aggregating at least $5,000.00 in value" and he or

she commits, *inter alia*, any of the following violations:

> 1.   knowingly causing the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causing damage without authorization to a protected computer (18 U.S.C. § 1030(a)(5)(A)); or
>
> 2.   intentionally accessing a protected computer without authorization, thereby causing damage and loss (18 U.S.C. § 1030(a)(5)(C)).[11]

18 U.S.C. §§ 1030(c)(4)(A)(i) and (g).

Arbor has a strong likelihood of success on the merits of its claims under both sections of

the CFAA listed above.  Gill and McEachin violated Section (a)(5)(A) of the CFAA because

they knowingly caused the permanent deletion of files from Arbor's computers, thereby

intentionally causing damage to Arbor.  Upon information and belief, Gill and McEachin

accomplished this deletion via a data erasure program or similar command to delete information

from the computers.  *See Dedalus Found.*, 2009 WL 3398595.[12]  Moreover, they were acting

without authorization; an employee ceases to act "with authorization" when he or she begins

acting as an agent of another.  *Guest-Tek Interactive Entm't Inc. v. Pullen*, 665 F. Supp.2d 42,

45-46 (D. Mass. 2009) (noting that First Circuit supports broad reading of the statute such that an

---

[11] The CFAA defines a "protected computer" as a computer used in interstate or foreign commerce or communication. 18 U.S.C. § 1030(e)(2)(B).  The statute defines the term "exceeds authorized access" to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  The CFAA defines the term "damage" to mean "any impairment to the integrity or availability of data, a program, a system, or information."  The CFAA defines the term "loss" to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense; and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).

[12] *See also Int'l Airport Centers, LLC v. Citrin*, 440 F.3d 418, 419-20 (7th Cir. 2006); *Arience Builders, Inc. v. Baltes*, 563 F. Supp.2d 883, 884-85 (N.D. Ill. 2008).

employee accesses a computer without authorization "whenever the employee, without the employer's knowledge, acquires an interest that is adverse to that of his employer"). For the same reasons, Gill and McEachin are also liable under Section (a)(5)(C) because they intentionally accessed a protected computer without authorization, and as a result of such conduct, caused both damage and loss. *See* 18 U.S.C. § 1030(a)(5)(C); *Lasco Foods, Inc. v. Hall and Shaw Sales, Mktg., & Consulting, LLC*, 600 F. Supp.2d 1045, 1051-52 (E.D. Mo. 2009) (deletion of information on company computer constituted both damage and loss).[13]

### B. Arbor Has A Strong Likelihood Of Success On The Merits Of Its Claims Against the Individual Defendants For Breach Of Contract (Count II).

In order to establish that the Individual Defendants breached their agreements with Arbor, Arbor must establish: (1) the existence of a contract; (2) for valid consideration;[14] (3) performance by Arbor and a breach by the Individual Defendants; and (4) damage to Arbor.[15] *See Singarella v. Boston*, 342 Mass. 385, 387 (1961).

---

[13] In addition to constituting a violation of the CFAA, Gill's and McEachin's actions constitute spoliation of evidence. Spoliation is the "intentional, negligent, or malicious destruction of relevant evidence." *Hofer v. Gap, Inc.*, 516 F. Supp.2d 161, 170 (D. Mass. 2007). The obligation to preserve evidence attaches when "[a] party has notice that the evidence relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). There is no doubt that Gill and McEachin were aware of their obligations, including the requirement to preserve and protect evidence in their possession. As Gill and McEachin cannot cure their improper destruction of information, they risk being sanctioned harshly. *See Wiedmann v. The Bradford Group*, 444 Mass. 698, 705 (2005) (doctrine of spoliation allows a court to "impose sanctions … for the destruction of evidence in civil litigation,' based on the premise that a party who has negligently or intentionally lost or destroyed evidence known to be relevant for an upcoming legal proceeding should be held accountable for any unfair prejudice that results.'").

[14] The Individual Defendants entered into their respective agreements voluntarily and for significant consideration, namely, employment with Arbor and the associated compensation and valuable benefits. When restrictive covenants are entered into at the inception of the employment relationship, as is the case here, it is well established that the requisite consideration is supplied by the employee's hiring, even if employment is only on an at-will basis. *See Stone Legal Res. Group*, 2003 WL 914994 at *5. Additionally, Ronca, Scanlon, and Hollyman received equity in consideration for the execution of their Danaher Agreements. Moreover, continued employment has been held to be sufficient consideration for enforceable restrictive covenants. *See New England Tree Expert Co. v. Russell*, 306 Mass. 504 (1940); *The Wrentham Co. v. Cann*, 345 Mass. 737, 741 (1963); *IME, Inc. v. Quaranto*, 1991 WL 11007754, *5 (Mass. Super. Ct. Feb. 7, 1991). Notably, Ronca reaffirmed his obligations by virtue of the Separation Agreement, under which he received post-termination compensation.

[15] As set forth in detail in the Complaint, The Individual Defendants' actions have damaged Arbor's legitimate business interests and have denied Arbor the benefit of its bargain with respect to the restrictive covenants. As

1.       **The Danaher Agreements and Arbor Agreements Are Enforceable**

Non-compete agreements and other restrictive covenants are enforceable to the extent

that they are "reasonable and necessary to protect the employer's legitimate interests while not

interfering with ordinary competition." *IKON Office Solutions, Inc. v. Belanger*, 59 F. Supp.2d

125, 128 (D. Mass. 1999). *See also Marcam Corp. v. Orchard*, 885 F. Supp. 294, 298 (D. Mass.

1995) (non-compete agreement may be enforced to protect a company's reputation and its

relationship with its customers). Such agreements are enforceable so long as they are (1)

necessary to protect an employer's legitimate business interests; (2) reasonably limited in time

and geographic scope; and (3) consonant with the public interest. *See Oxford Global Res., Inc. v.*

*Guerriero*, 2003 WL 23112398, *6 (D. Mass. Dec. 30, 2003).

a.       **The Agreements Are Necessary To Protect Arbor's Legitimate**
         **Business Interests**

The protection of goodwill, confidential information, and trade secrets are widely

accepted as legitimate business interests served by restrictive covenants. *See New England*

*Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 674 (1977) ("If any or all of these interests [trade

secrets, confidential information, and goodwill] are present in a given case in which a

noncompetitive covenant is part of a contractual agreement, . . . a court of equity will not deny

enforcement of a reasonable covenant."); *Guerriero*, 2003 WL 23112398 at *6 ("Trade secrets,

confidential data, and goodwill are all legitimate business interests of the employer that it may

seek to protect by restrictive covenant."). Arbor sought to protect these interests by virtue of the

agreements signed by the Individual Defendants.

---

noted above, Arbor has spent thousands of dollars hiring and training employees to fill the positions left by the
Individual Defendants. Moreover, as explained *infra*, Arbor will be irreparably harmed by the Defendants' actions.

The Danaher Agreements and the Arbor Agreements protect Arbor's goodwill. Goodwill is "a broad term and encompasses a variety of intangible business attributes such as the name, location and reputation, which tends to enable the business to retain its patronage." *EMC Corp. v. Gresham*, 2001 WL 1763449, *3 (Mass. Super. Ct. Nov. 14, 2001) (citations and internal punctuation omitted). Goodwill includes "[a]n employer's positive reputation or position in the eyes of its customers or potential customers." *Id.* As such, "[g]ood will generally applies to customer relationships." *Kroeger v. Stop & Shop Cos.*, 13 Mass. App. Ct. 310, 316 (1982) (citations omitted). Additionally, "[a]n ability to harm the employer's good will may derive from knowledge of confidential information." *Wordwave, Inc. v. Owens*, 2004 WL 3250472, *2 (Mass. Super. Ct. Dec. 7, 2004).

As set forth in great detail in the Complaint and Affidavits filed herewith, over the past twelve years, Arbor has contributed great time and expense to develop its goodwill with its customers, including encouraging its employees to entertain customers (and reimbursing any resultant expenses) and conducting yearly customer summits. This goodwill belonged to Arbor, not the Individual Defendants, due to the expense that Arbor incurred in allowing the Individual Defendants to entertain and develop clients and prospective clients. *See Bowne of Boston, Inc. v. Levine & Merrill Corp.*, 1997 WL 781444, *3 (Mass. Super. Ct. Nov. 25, 1997). As described above, many of the Individual Defendants inherited long-standing relationships nurtured by Arbor over the years. *See McFarland v. Schneider*, 1998 WL 136133, **42-43 (Mass. Super. Ct. Feb. 17, 1998) (goodwill belonged to employer because the employer supplied "the institutional training, support and synergy that enable the employee to provide services of the quality the client values so highly").[16]

---

[16] *See also Stone Legal Res. Grp., Inc. v. Glebus*, 2003 WL 914994, **3-4 (Mass. Super. Ct. Dec. 16, 2002); *Randstad Gen. Partner (US) LLC v. Cruz*, C.A. No. 09-2046-A, p. 5 (Mass. Super. Ct. May 28, 2010) (combination

The agreements are also necessary to protect Arbor's confidential information and trade secrets. In determining whether business information is confidential or a trade secret, Massachusetts courts assess six factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees within the company; (3) the extent of measures taken by the employer to protect the secrecy of the information; (4) the value of the information to the company and to its competitors; (5) the amount of effort or expense incurred by the employer in developing this information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972); *Touchpoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp.2d 23, 27-28 (D. Mass. 2004). Broadly speaking, confidential information or a trade secret includes "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Bechtel Infrastructure Corp. v. Mass. Turnpike Auth.*, 2003 WL 21108412, *4 (Mass. Super. Ct. Apr. 10, 2003).

The information protected by the Danaher Agreements and Arbor Agreements constitutes protectable confidential business information. Arbor has devoted substantial time and millions of dollars to developing and compiling its valuable information into its protected computer systems, including the ASP and SVN, which are only accessible to certain key employees. This confidential information is extremely valuable to Arbor and would be just as valuable to a competitor. Arbor makes extensive efforts to protect its confidential business information through the use of its secure databases, employee agreements, and security policies.

---

of employee's talents and company resources produced results; thus, goodwill belonged to the employer); *Lombard Med. Techs., Inc. v. Johannessen*, 2010 WL 2682449, *5 (D. Mass. July 2, 2010) (former employees benefitted from employer's "investment of considerable resources in ensuring continued relationships");

The knowledge of Arbor's products that the Individual Defendants developed while working for Arbor, including "source code, implementation, [and] overall design," constitutes confidential information, *Touchpoint Solutions*, 345 F. Supp. 2d at 28, as does their intimate knowledge of the strengths and weaknesses of Arbor's products. *See Lombard*, 2010 WL 2682449 at *5; *Marcam*, 885 F. Supp. at 297. Arbor's goodwill and confidential information, therefore, are protectable by the Danaher Agreement and the Arbor Agreements.

### b.      The Agreements Are Reasonably Limited In Scope

The scope of the agreements are reasonable. Courts have held that a twelve month restrictive period is reasonable in situations such as this. *See, e.g., Guerriero*, 2003 WL 23112398 at *9; *Advanced Cable Ties, Inc. v. Hewes*, 2006 WL 3292810, *2 (Mass. Super. Ct. Oct. 19, 2006) (one year was "well within the umbrella of reasonableness for employment contracts"); *Marcam*, 885 F. Supp. at 296. In fact, courts have routinely upheld greater restrictions on solicitation by a former employee, *see Bowne of Boston, Inc. v. Levine*, 1997 WL 781444, *4 (Mass. Super. Ct. Nov. 25, 1997) (noting that Massachusetts courts consistently enforce covenants of up to five years). Indeed, where the primary purpose of the non-compete agreement is to protect confidential information and trade secrets - as is the case here - the temporal restriction is viewed very liberally. *See Oxford Global Res., Inc. v. Cerasoli*, C.A. No. 05-4016-BLS2 (Mass. Super. Ct. June 22, 2006).

In addition, the geographic scope of the agreements is reasonable. "[E]ven in the employment context, large geographic areas are deemed reasonable in some circumstances." *Boulanger v. Dunkin' Donuts Inc.*, 442 Mass. 635, 644 (2004).[17] *See also Advanced Cable Ties*,

---

[17] Nationwide restrictive covenants have routinely been upheld in circumstances similar to those present here. *See Marcam*, 885 F. Supp. at 299 (upholding nationwide scope where company maintained customer base and did business throughout North America); *Guerriero*, 2003 WL 23112398 at*10 (enforcement of restrictive covenant with no limitation in geographic scope was reasonable in light of plaintiff's nationwide business).

2006 WL 3292910 (lack of geographical limit did not preclude national enforcement of restrictive covenant).[18]

### c. The Agreements Are Consonant With Public Policy

Public policy supports enforcement of the agreements. "[I]t is [. . .] beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent." *Id*. An employer has a right to protect its trade secrets, confidential business information, and goodwill. *Edwards v. Athena Capital Advisors, Inc.*, 2007 WL 2840360, *6 (Mass. Super. Ct. Aug. 7, 2007); *Lombard*, 2010 WL 2682449 at *4 ("The public has an interest in the enforcement of valid contracts.").

### 2. The Individual Defendants Have Breached Their Agreements.

Arbor has performed all of its obligations under the agreements. As described below, the Individual Defendants have breached their respective agreements with Arbor.

### a. Ronca's, Scanlon's, and Hollyman's Breaches

### i. Breach Of The Non-Compete Provision

Ronca, Scanlon, and Hollyman breached their contractual obligations under the Danaher Agreements by accepting employment with Red Lambda, a competitor of Arbor, within the twelve month period following termination of their employment with Arbor. Whether a company is a competitor is generally liberally construed. Indeed, Massachusetts courts have determined that even complementary products may be competitive. *See, e.g., Ounce Labs, Inc. v. Harwood*, Suffolk Superior Court C.A. No. 08-02377-BLS1 (June 18, 2008) (Gants, J.) (granting preliminary injunction prohibiting former employee from working for competitor, and finding that despite the complementary nature of companies' products, the parties remained

---

[18] Should this Court determine that the geographic scope of the agreements is unreasonable, which Arbor strenuously disputes, this Court may narrow or reform the agreements as necessary. *All Stainless, Inc. v. Colby*, 364 Mass. 773, 778 (1974); *New England Tree Expert Co. v. Russell*, 306 Mass. 504, 508-09 (1940).

competitors, as some prospective customers would choose between them in deciding who to retain); *Lombard*, 2010 WL 2682449 at *6 ("competing companies rarely offer identical products . . . . Two companies 'are in direct competition not because they manufacture identical products, but because a consumer . . . would turn only to one of the these entities' products to solve its problems. Purchasing both of these products would not be a sensible course.'").[19]

Moreover, the broad language contained in the agreements to define competition, and in particular the agreements' use of the terms "development" and "develops,"[20] supports the conclusion that Red Lambda is a competitor. *See EMC Corp. v. Kempel*, 2001 WL 1763451, *5 (Mass. Super. Ct. Nov. 20, 2001) ("With the inclusion of the word 'developing,' it is not necessary for [plaintiff] to show that [the alleged competitor] has a product that competes with those of its own or that those of its own are in a state beyond 'being developed.'").

### ii. Ronca's Solicitation of Arbor Employees

Upon information and belief, within twelve months of his termination, Ronca solicited the remaining Individual Employees to work for Red Lambda. Notably, Fleming and Shirley resigned Arbor and became employed by Red Lambda within twelve months of Ronca's termination. In light of Ronca's animosity towards Arbor following his termination, as evidenced by his threat to retaliate against Arbor, it is highly probable that he directly solicited these employees during the restrictive period. Porter, Gill, Henkart, McEachin, and Neel all resigned from Arbor and joined Red Lambda within 1-2 months after Ronca's restrictive period

---

[19] *See also Sentient Jet, Inc. v. Lambert*, 2002 WL 31957009, *6 (Mass. Super. Ct. Nov. 18, 2002) (company that does only 10 to 30 percent of what former employer does was still competitor); *IONA Techs., Inc. v. Walmsley*, 2002 WL 1290217, *4 (Mass. Super. Ct. Apr. 29, 2002) (companies were competitors even though competition was only at margins and "in a very small portion of [the plaintiff's] product lines.").

[20] The Danaher Agreement provides at Section 6(c) that Ronca, Scanlon, and Hollyman will not directly or indirectly participate in "planning, research or *development*" of competitive products (emphasis added). The Arbor Agreements provide that the remaining Individual Defendants will not directly or indirectly participate in any business activity which "*develops*, manufactures or markets products or performs services which are competitive with or similar to" Arbor's products or services, including products under *development* at Arbor (emphasis added).

expired.  Upon information and belief, discovery will demonstrate that Ronca solicited these employees prior to the expiration of the restrictive period in violation of the Danaher Agreement.

### iii.  Ronca's Solicitation of Arbor Customers

Ronca also solicited or encouraged Arbor's customers or potential customers to purchase Red Arbor products or services within the twelve month period following his termination. Ronca was in talks with TWT as early as June of 2011 to sign a mutual non-disclosure agreement with Red Lambda.  As noted above, it is highly likely that Ronca contacted other Arbor customers on Red Lambda's behalf, but these communications have not been mistakenly shared with Arbor.

### iv.  Ronca's Disparagement

Finally, upon information and belief, Ronca breached the Danaher Agreement by disparaging Arbor to VeriSign, causing a VeriSign officer to express concern about Arbor's technology and loss of staff, and likely damaging Arbor's reputation with VeriSign.

### b.  The Remaining Individual Defendants' Breaches

### i.  Breach Of The Non-Compete Provision

The remaining Individual Defendants breached their Arbor Agreements by accepting employment with Red Lambda within the twelve month period following termination of their employment with Arbor.  Notably, Henkart, Neel, Gill, and McEachin refused to identify their new employer, suggesting that they were aware that their new positions were competitive with Arbor.  This is further supported by the fact that Arbor expressly told these defendants that it considered Red Lambda a competitor.  Neither the Individual Defendants nor Red Lambda have provided *any* evidence to Arbor that the Individual Defendants are working in non-competitive positions for Red Lambda, and in fact have completely ignored Arbor's demands that they

provide Arbor with certifications to this effect. While Arbor would be amenable to the Individual Defendants working for Red Lambda in non-competitive positions, the Defendants' complete disregard for Arbor's legitimate concerns leaves Arbor no choice but to assume that the Individual Defendants are indeed working in competitive positions for Red Lambda.

### ii. Solicitation of Arbor Customers

The Individual Defendants also solicited or encouraged Arbor's customers (including Comcast and TWT) to purchase Red Arbor products or services. For example, Shirley was in contact with TWT on behalf of Red Lambda just two months after leaving Arbor, and Porter was in contact with TWT on Red Lambda's behalf less than three weeks after leaving Arbor. In addition, Porter and Henkart were in communication with Comcast just weeks after resigning from Arbor to discuss a "team meeting" on behalf of Red Lambda.

### C. Arbor Has A Strong Likelihood Of Success On The Merits Of Its Claim Against Ronca For Intentional Interference With Contractual Relations (Count III).

To establish a claim for interference with contractual or advantageous relations against Ronca, Arbor must prove that: (1) it had an existing business relationship or contemplated contract of economic benefit; (2) Ronca knew about such relationship; (3) Ronca intentionally interfered with that relationship with improper motive or means; and (4) Arbor was actually damaged as a direct result of Ronca's conduct. *See Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 421 (D. Mass. 1995) (citations omitted).

The evidence shows that Ronca knew of Arbor's contractual relationships with the remaining Individual Defendants, because he had signed a similar agreement during his employment with Arbor. Ronca intentionally interfered with these relationships with improper motive or means by soliciting the remaining Individual Defendants to leave Arbor for Red Lambda in violation of their agreements, in furtherance of his own interests or those of Red

Lambda. Ronca's threats to retaliate against Arbor when he was terminated evidence his improper motive for soliciting the remaining Individual Defendants, as do his veiled criticism of Arbor's "appliance-based network security solutions" in the press release issued by Red Lambda, an obvious response to Arbor's stinging rebuke of his Arbor 7 plan, *see* Complaint, ¶ 93. Arbor's refusal to sell Peak Flow X to Ronca also contributed to Ronca's ill will. As a result, he poached nine Arbor employees as a means to satisfy his personal vendetta against Arbor and left Arbor in the unenviable position of finding qualified replacements for these key employees. Thus, Ronca had "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Nat'l Econ. Research Assocs., Inc. v.* Evans, 2008 WL 4352600, *9 (Mass. Super. Ct. Sept. 10, 2008). *See also Talentburst, Inc. v. Collabera, Inc.*, 567 F. Supp.2d 261, 268 (D. Mass. 2008) (goal of harming plaintiff or obtaining its confidential information can constitute improper motive).[21] Arbor has been damaged as a result of Ronca's interference in losing nine additional key employees to date, as it has had to spend precious resources replacing the departed employees and training new hires. *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 21 (1997). Therefore, Arbor is likely to succeed on its intentional interference claim against Ronca.

D.     **Arbor Has A Strong Likelihood Of Success On The Merits Of Its Claim Against Red Lambda For Intentional Interference With Contractual Relations (Count IV).**

Upon information and belief, Red Lambda was aware of Ronca's, Scanlon's, and Hollyman's obligations under the Danaher Agreements, because Section 8 of the Danaher Agreements required them to share the agreement with any subsequent employers for five years following the termination of their employment with Arbor. Accordingly, Red Lambda knew or should have known that the remaining Individual Defendants had executed similar agreements.

---

[21] Ronca's knowledge of the remaining Individual Defendants' agreements with Arbor and apparent active encouragement of the breach of these agreements similarly constitutes improper means. *Hilb Rogal & Hobbs of Mass., LLC v. Sheppard*, 2007 WL 5390399 (Mass. Super. Ct. Dec. 31, 2007).

Red Lambda also knew or should have known about Arbor's contractual relationships with the Individual Defendants, because upon information and belief, Ronca was aware of these relationships, and such knowledge was therefore imputed to Red Lambda. *See, e.g., Cheng v. Sunoco, Inc. (R&M)*, 2010 WL 5437235, at *5 (D. Mass. Dec. 22, 2010) (knowledge of employee, as agent acting within the scope of her authority was imputed to employer); *Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 66-67 (1997) (under agency principles, notice to a corporation's agent, including an employee, is notice to the corporation). Red Lambda was also put on notice of Arbor's agreements with the Individual Defendants no later than April 18, 2012, when its CEO received a letter from Arbor counsel attaching Ronca's executed Danaher Agreement and executed Arbor Agreements.

Upon information and belief, Red Lambda intentionally interfered with these relationships with improper motive or means by employing the Individual Defendants in violation of their agreements, in furtherance of its own interests and at Arbor's expense, based on its knowledge of the Individual Defendants' agreements with Arbor and apparent active encouragement of the breach of these agreements. *Hilb Rogal & Hobbs*, 2007 WL 5390399. As noted *supra*, Arbor has already been damaged as a result of Red Lambda's interference. *Linkage Corp.*, 425 Mass. at 21.

E. **Arbor Has A Strong Likelihood Of Success On The Merits Of Its Claim Against Red Lambda For Violation Of Chapter 93A (Count V).**

Arbor has a strong likelihood of success on its Chapter 93A claim against Red Lambda. Upon information and belief, Red Lambda has engaged in unfair and deceptive conduct by aiding and abetting the Individual Defendants in their breaches of their respective agreements, and therefore intentionally interfering with those agreements, as explained *supra* in Section D. *See Melo-Tone Vending v. Sherry, Inc.*, 39 Mass. App. Ct. 315, 320 (Mass. App. Ct. 1995)

(intentional interference with contractual relations could serve as basis for Chapter 93A claim);

*Cambridge Internet Solutions, Inc. v. Avicon Group,* 1999 WL 959673, *3-4 (Mass. Super. 1999)

(denying motion to dismiss Chapter 93A claim based on intentional interference with contractual

relations). Accordingly, Red Lambda is likely to be liable for violating Chapter 93A.

## II. ARBOR WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT THE REQUESTED INJUNCTIVE RELIEF.

Arbor will suffer irreparable harm if this Court does not grant the requested injunctive

relief, as it is likely to lose its goodwill with customers as a result of the Individual Defendants'

continued employment with Red Lambda. *BNY Mellon, N.A. v. Schauer*, 2010 WL 3326965 *10

(Mass. Super. Ct. May 14, 2010) (loss of goodwill constitutes irreparable harm); *Stone Legal*

*Res. Group*, 2003 WL 914994 at *6 (same). Ronca has already potentially damaged Arbor's

relationship with VeriSign, and Arbor has reason to believe that one or more of the Individual

Defendants disparaged Arbor to AT&T, causing AT&T to express doubts about Arbor's ability

to meet its needs. Additionally, the Individual Defendants have already demonstrated that they

are willing to solicit Arbor's clients, which will likely result in the loss of business that Arbor

will be unable to quantify. Arbor cannot determine whether any of its current customers will

terminate or modify their relationship with Arbor based on solicitation that is occurring now.

Arbor may not know for years whether certain customers will leave Arbor due to the

Defendants' actions. *Hilb*, 2007 WL 5390399 ("The problem, however, is the long term. Once a

client transfers its business, there is no way to determine how long it would otherwise have

stayed with [the employer], particularly in the absence of the individual employee familiar to

it."); *Randstad Gen. Partner*, C.A. No. 09-2046-A, p. 6 (noting difficulty in developing a

measure of damages that adequately compensates former employer for losses, because "it would

be virtually impossible to determine whether or not [solicited] customers would have joined

defendant's new employer without that solicitation or, even more importantly, how long they might remain and how much future business they might direct to the new employer.").

Arbor is also at risk of losing its trade secrets and confidential information by virtue of the Individual Defendants' continued employment with Red Lambda. *See Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 616 (1980) (injunctive relief appropriate where plaintiff "*may* suffer a loss of right that cannot be vindicated should it prevail after a full hearing on the merits") (emphasis added). The risk that the Individual Defendants will use Arbor's confidential information, even inadvertently, and thereby cause Arbor to lose goodwill with its customers supports the entry of an injunction. *See IONA Techs.*, 2002 WL 1290217 at *3 (plaintiff need not wait until actual harm occurs to be entitled to injunctive relief). Absent injunctive relief, the Individual Defendants will be able to use confidential information obtained during their employment with Arbor to compare Red Lambda's products with Arbor's products, potentially in an unfavorable and disparaging way, to compete directly and unfairly with Arbor.[22] Thus, by their very employment with Red Lambda and their efforts to convert Arbor's customers to Red Lambda, the Individual Defendants continue to irreparably harm Arbor's goodwill and reputation. *See, e.g., Warner-Lambert Co. v. Execuquest Corp.*, 427 Mass. 46, 50 (1998); *Touchpoint Solutions*, 345 F. Supp.2d at 32; *BNY Mellon*, 2010 WL 3326965 at *10. Defendants should not be allowed to reap the benefits of Arbor's work. Arbor "has the right to keep the work which it has done… to itself. The fact that others might do similar work, if they might,

---

[22] Even assuming that they are willing to certify that they will not use or disclose Arbor's confidential information, the harm to Arbor cannot be avoided simply by Defendants' "intention not to disclose confidential information, or even by [their] scrupulous efforts to avoid disclosure." *Marcam*, 885 F. Supp. at 297. The doctrine of inevitable disclosure "allows the court to enjoin a former employee from working at a competitor of the employer . . . if the court finds that such employment would inevitably lead to disclosure" of confidential business information or trade secrets. *Architext, Inc. v. Kikuchi*, 2005 WL 28464244, *3 (Mass. Super. Ct. May 19, 2005); *Ounce Labs*, C.A. No. 08-2377-BLS1 ("the risk of subtle inevitable disclosure is precisely the type of competitive harm that a brief period of noncompetition is designed to prevent"); *Lombard*, 729 F. Supp.2d at 442 ("Despite defendants' assertions, it is impossible to imagine that they will not use, consciously or not, information they have gleaned during their time [with the former employer] . . . [D]isclosure would be inevitable.") (citing *Marcam*).

does not authorize them to steal the plaintiff's." *Diversified Ventures, Inc. v. Moriarty*, 1994 WL 879858, *18 (Mass. Super. Ct. 1994).

Allowing the Individual Defendants to continue working for Red Lambda and soliciting Arbor's customers will further damage Arbor's legitimate business interests. Arbor does not have an adequate remedy at law to compensate it for the Defendants' actions. *See Guerriero,* 2003 WL 23112398; *Stone Legal Res. Group*, 2003 WL914994 at *6. Because the loss of Arbor's confidential information and goodwill cannot be quantified, Arbor has been irreparably harmed, and without injunctive relief, will be irreparably harmed further. [23]

## III.    THE IRREPARABLE HARM TO ARBOR OUTWEIGHS ANY HARM THAT INJUNCTIVE RELIEF WOULD INFLICT ON DEFENDANTS.

The balance of the hardships tips strongly in Arbor's favor. As discussed above, Arbor will be irreparably harmed in various ways if the Court does not grant the requested injunctive relief. The harm, if any, to Defendants if the Court prohibits Defendants from soliciting Arbor customers and employees pales in comparison to the irreparable harm that Arbor will incur from the publication and exploitation of its confidential information and trade secrets. Moreover, denying injunctive relief would allow Defendants to use Arbor's confidential information and exploit Arbor's years of hard work and effort to compete unfairly with Arbor. In sum, the balance of harms weighs in favor of Arbor and granting the requested injunctive relief.

---

[23] To the extent the Defendants claim that injunctive relief should not issue due to delay, such an argument is unavailing. While Arbor was concerned about the departure of Shirley and Fleming following Ronca's termination, at that time, Red Lambda was in "start-up" mode, and thus Arbor did not have the evidence it now possesses that Red Lambda was a competitor. In addition, the resignations of the majority of the Individual Defendants (Gill, Neel, McEachin, Porter, and Henkart) did not occur until March and April of 2012, at which point it first became clear that Ronca was targeting his former Arbor team to work for Red Lambda. Immediately after these departures, Doherty reached out to Ronca to demand that any wrongful conduct cease. Arbor also sent cease and desist letters to all Defendants, except Scanlon, within weeks of these departures. In addition, Arbor has made several attempts to negotiate with the Defendants over the last few months, to no avail. "Parties to a business dispute deserve praise, not penalty, for attempting to negotiate their differences before knocking on the courthouse door." *Alexander & Alexander*, 488 N.E.2d at 28. Finally, the delay, if any, has inured to the Defendants' benefit. *See Randstad Gen. Partner,* C.A. No. 09-2046-A, p. 6 (refusing to deny injunctive relief based on alleged delay).

## IV. THE GRANTING OF THE REQUESTED INJUNCTIVE RELIEF WILL NOT ADVERSELY AFFECT THE PUBLIC INTEREST.

Injunctive relief in this case will serve the public interest by upholding valid contracts and prohibiting the Defendants from unfairly competing with Arbor. Fair competition is in the public interest. Unfair competition is not. As noted above, public policy supports enforcement of the agreements. "[I]t is [. . .] beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent." *Guerriero*, 2003 WL 23112398 at *10. An employer has a right to protect its trade secrets, confidential business information, and goodwill. *Edwards*, 2007 WL 2840360 at *6; *Lombard*, 2010 WL 2682449 at*4 ("The public has an interest in the enforcement of valid contracts."); *New England Circuit Sales, Inc. v. Randall*, 1996 WL 1171929, *3 (D. Mass. June 4, 1996) ("It is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged."). Nothing in the requested injunctive relief will have any adverse effect on the public interest, and to the contrary, will further the public interest.

## CONCLUSION

For the foregoing reasons, the Court should grant Arbor's Motion for a Temporary Restraining Order and issue a temporary restraining order consistent with the proposed Order, attached to said motion as Exhibit 1, and after a hearing, grant Arbor's Motion for a Preliminary Injunction and issue a preliminary injunction consistent with the proposed Order, attached to said motion as Exhibit 1.

Respectfully submitted,

ARBOR NETWORKS, INC.

By its attorneys,


 /s/ *Dawn Mertineit*
Katherine E. Perrelli (BBO #549820)
Dawn Mertineit (BBO #669988)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Dated: July 19, 2012                (617) 946-4800

14632941v.10