UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARBOR NETWORKS, INC.,<br><br>      Plaintiff,<br><br>v.<br><br>WILLIAM E. RONCA III, RICHARD SHIRLEY, DOUGLAS FLEMING, JAMES GILL, JAMES NEEL, JASON MCEACHIN, MICHAEL L. PORTER, ANDREW HENKART, PAUL SCANLON, MICHAEL HOLLYMAN, and RED LAMBDA, INC.,<br><br>      Defendants. | Case No. 1:12-cv-11322-NMG |

### RED LAMBDA INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION[1]

## I.   Introduction

On February 4, 2011, Defendant, William Ronca left employment with Arbor Networks, Inc. ("Arbor").  In April 2011, Mr. Ronca started work at Red Lambda, Inc. ("Red Lambda").  Fourteen months ago, Arbor knew that Mr. Ronca had gone to work for Red Lambda, Inc.  Over the course of the next year and a half, the remaining Individual Defendants left a work environment at Arbor that was becoming increasingly hostile to their ability to advance in their careers and chose to work for Red Lambda – some after working for intervening employers.  More than a year and a half after Mr. Ronca left Arbor, and after Mr. Ronca's, Mr. Shirley's and Mr. Fleming's non-competition agreements had expired, Arbor filed this lawsuit against Red Lambda for hiring them and others who used to work at Arbor.

---

[1] Red Lambda files this Response by special appearance and does not hereby waive any right to later raise any challenge as to venue or jurisdiction.

Arbor has filed ex parte motions against Red Lambda, a Florida corporation, not doing business in Massachusetts, seeking a temporary restraining order and preliminary injunction to prevent Red Lambda from gainfully employing at least seven Red Lambda employees, all of whom are not now, nor were they while working for Arbor, residents of Massachusetts. Arbor's delay of more than a year before raising unsubstantiated allegations of emergency evidences the absence of irreparable harm as well as Arbor's recognition that Red Lambda is not a competitor.

Arbor's two counts against Red Lambda arise from alleged inducement of the Individual Defendants' to breach agreements with Arbor. Arbor's claims do not state a cause of action. The agreements are unenforceable and, in many cases expired, and, even were they in force, have not been breached, because Red Lambda and Arbor are not competitors. Arbor further has very little likelihood of success on the merits of its claims against Red Lambda as it has not and cannot support the allegations necessary to assert a tortious interference with contract claim. Its claim under M.G.L. Section 93A fails because all the acts complained of took place outside of Massachusetts and tortious interference is not a basis of such statutory claims.

## II.  <u>Facts</u>[2]

The Individual Defendants' joined employment with Arbor at various times between 2004 and 2009.[3] They all worked in the America's sales group, performed well, earned large bonuses, and enjoyed working together. Then, in 2009, changes came to Arbor. New management resented the America's sales team's compensation and sought to cut the sales team's opportunity to earn large bonuses. This new punitive and restrictive environment within Arbor resulted in the sales employees seeking to leave. Employees left Arbor for a variety of

---

[2] Red Lambda adopts by reference the facts set out in the Response Brief filed this same date by the Individual Defendants.
[3] <u>See</u> Individual Defendants' Affidavits, filed this same date.

different employers.[4]  By 2010, Arbor employee dissatisfaction was rampant.  Concerns with management combined with changes in compensation structure – resulting in significant concerns about the decrease in revenue – motivated multiple Arbor employees, including the Individual Defendants, to begin searching for other employment.[5]  When the first three, defendants Ronca, Shirley and Fleming, left to work for Red Lambda, no lawsuit was filed for over a year and a half, long after their non-compete agreements had expired.  Only after ten of Arbor's former employees had joined Red Lambda did Arbor decide to file a lawsuit and claim that this was an irreparable emergency.

Red Lambda did not interview any additional employees from Arbor until Mr. Ronca's separation agreement expired.[6]  Red Lambda hired the remaining Individual Defendants in 2012. Id.  Some of the Individual Defendants came to Red Lambda after leaving the employment of Arbor, others came to Red Lambda from employment with another company, LineRate Systems.[7]  All of the Individual Defendants received offer letters from Red Lambda that included the following language:[8]

> "Red Lambda expects you to abide by any continuing enforceable obligations you may have to prior employers or others.  We do not want you to breach any such obligations or to use any confidential trade secret information of any third party in the course of your employment with Red Lambda."

Red Lambda was unaware of the terms of the Individual Defendants' non-competition agreements at the time they were hired.  Id.  At no time did Red Lambda understand Arbor to be a competitor.  Id.  Red Lambda's Big Data product is not a competitor with Arbor's DDoS mitigation products.  Arbor's failure to raise any objection to the hire of Ronca, Shirley and Fleming supports Red Lambda's belief.

---

[4] See Scanlon and Hollyman Aff.
[5] See e.g., Hollyman Aff. ¶¶ 15-17, 22-26.
[6] See Individual Defendants' Aff.
[7] See Scanlon and Hollyman Aff.
[8] See Carter Aff.

Individual business customers attempting to protect computer systems buy both (1) Directed Denial of Service ("DDoS") protection, like Arbor's, and (2) Big Data artificial intelligence, like Red Lambda's to protect against different risks.  (Henkart Aff., and Ex. 1 attached thereto.)  The products are not substitutes for one another.  (Id.)  They provide different services and do not compete in the same markets.  (Id.)  Because there are numerous ways in which the security of a network can be compromised, there are numerous companies offering solutions to address particular security issues.  (Id. ¶ 22.)  A well-secured network typically has dozens of security systems provided by different vendors, each addressing particular threats.  (Id. ¶ 23.)

Arbor provides DDoS flow based detection and mitigation.  (Id. ¶¶ 15, 26.)  Arbor sells only two products, Peakflow and Pravail, both of which provide a solution to DDoS threat.  (Id. ¶ 24.)  Arbor's products are appliance-based, i.e. a piece of electronic hardware, with pre-loaded software, that is physically installed on a customer's network.  (Id. ¶ 25.)  The Arbor products also perform what is known as visibility, security, and analysis on flow-based[9] structured data[10] to identify certain specific types of malware (malicious software that infects a computer), to identify DDoS attacks, and to measure the amount of traffic between different points in, from, or to a network.  (Id. ¶ 26.)

Red Lambda competes in the Big Data artificial intelligence security market.  (Id. ¶¶ 21, 28.)  The term Big Data refers to large amounts of complex structured, unstructured, and binary data.  (Id. ¶ 27.)  MetaGrid, Red Lambda's only product, provides a solution to the problem of analyzing Big Data.  MetaGrid is a software platform that enables distributed supercomputing[11]

---

[9] "Flow-based" refers to a record of traffic that flows across a network.

[10] "Structured data" is data that has a pre-defined format.

[11] Distributed supercomputing means that the computing function can be shared between any number and numerous types of computers (including notebooks, tablets, smartphones, desktops, servers) on any network on the internet.

to analyze Big Data and uses Artificial Intelligence (AI) to perform automated data mining to find unique events buried in large amounts of varied types of data without any signatures or rule configurations.  (Id. ¶ 28.)

### III.   Legal Standard for Preliminary Injunction or Temporary Restraining Order

A party seeking a preliminary injunction or temporary restraining order must establish that (1) it is substantially likely to succeed on the merits of its claim; (2) absent the injunction there is a significant risk of irreparable harm; (3) the balance of hardships weighs in its favor; and (4) the injunction will not harm the public interest.  See Francisco Sanchez v. Esso Standard Oil Co., 572 F.3d 1, 14 (1st Cir. 2009).  As the party seeking injunctive relief, Arbor bears the burden of proof.  See, e.g., Genuine Parts Co. v. Autoparts Int'l, Inc., 2009 WL 2603163, at *4 (Mass. Super. Ct. Aug. 6, 2009).  "[T]he significant remedy of a preliminary injunction should not be granted unless the plaintiff[ ] ha[s] made a clear showing of entitlement thereto." BNY Mellon, N.A. v. Schauer, 2010 WL 3326965, at *7 (Mass. Super. Ct. May 14, 2010) (quoting Student No. 9 v. Bd. of Educ., 440 Mass. 752, 762 (2004) (other citations omitted).  Arbor has not done so.

The award of such an injunction is an "extraordinary remedy" that should not regularly be granted.  Francisco Sanchez v. Esso Standard Oil Co., 572 F.3d 1, 14 (1st Cir. 2009). "Injunctive relief either by way of a temporary restraining order or by a preliminary injunction implicates a power of equity which should be exercised delicately.  It should not be exercised routinely and the court should refuse to grant such relief unless the circumstances require it." Boston Software Sys., Inc. v. Doherty, C.A., No. 07-1059-BLSI (Mass. Super Ct. Apr. 3, 2007) ( a copy of which is attached hereto as Exhibit A).  Furthermore, "[w]ith respect to noncompetition agreements in particular, a court should exercise its equitable powers to enforce them sparingly since such contracts restrict an individual's ability to work." Reebok Int'l, Ltd. v.

Rattet, C.A. No. 08-0747 at 4 (Mass. Super. Ct. Apr. 29, 2008) (citing Marine Contractors v. Hurley, 365 Mass. 280, 287 (1974)) (a copy of which is attached hereto as Exhibit B).

If this Court was to grant Plaintiff's motion, it must also impose a bond as required by Rule 65(c). Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by ay party found to have been wrongfully enjoined or restrained"). Given that the injunction sought by Arbor would put ten people immediately out of work, Red Lambda's business would be severely interrupted and request that any such bond be, at minimum, ten million dollars, sufficient to address the significant damage that would be caused to Red Lambda and the Individual Defendants as a result. See, e.g., Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488, 492 n.3 (1986) (imposing a $500,000 bond) with injunction against an employee.

## IV.   Legal Argument and Analysis

### A.   The Balance of Harm Between the Parties Weighs Heavily Against Entry of an Injunction or Temporary Restraining Order.

1.   Arbor's Delay of More Than a Year and Lack of Facts Demonstrating Threat of Harm Indicate No Need for a TRO or Preliminary Injunction

William Ronca left the employment of Arbor on February 4, 2011. (Ronca Aff. ¶ 4.) He joined Red Lambda several months later. (Ronca Aff. ¶ 16.) A press release was issued by Red Lambda on May 11, 2011, advising of Mr. Ronca joining Red Lambda. (Id. ¶ 25.) The May 2011 press release described Red Lambda's product market. (Id.). The CEO of Arbor, Colin Doherty, contacted Mr. Ronca and congratulated him on going to work at Red Lambda. (Id.). At no time before the expiration of Ronca's non-compete did Arbor claim. (Id. ¶ 26.) Arbor's

claims now appear to be more a concern about stemming the tide of its remaining salespeople leaving after creating an environment hostile to their success.

William Ronca, Richard Shirley and Doug Fleming all left the employment of Arbor and went to work for Red Lambda almost a year and a half before the plaintiff brought this action.[12] Arbor now claims it will suffer irreparable harm if these three individuals and the rest of the former employees of Arbor continue working at Red Lambda.  Why is it an emergency now and it was not an emergency for the last year and a half?  Plaintiff provides no explanation, just unsupported conjecture against its former employees and Red Lambda.

In the severance agreement entered into between Ronca and Arbor,[13] Arbor specifically designated the three competitors from which Ronca was barred from employment:  "Intruguard Devices, Inc., Riorey, Inc. and Radware, Inc. and each of their parents and subsidiaries." (Dkt. 1-2 at 3.)  All three of the companies specifically mentioned in paragraph (iii) of the Ronca separation agreement are DDoS flow based detection and mitigation companies, the same market that Arbor competes in.[14]  Red Lambda was not one of them.  In fact, no "Big Data" artificial intelligence software platform companies were identified as being competitors.

Plaintiff has failed to satisfy its burden of demonstrating that the absence of the requested injunctive relief will result in irreparable harm.  Am. Fed'n of State, County & Mun. Employees, Council 93, AFL-CIO, Local 419 v. Rouse, 2002 WL 1584583, *2, C.A. No. 02-1819 (Mass. Super. May 30, 2002) (Troy, J.) ("[I]n order for plaintiff to show irreparable harm, plaintiff must establish 'injury that is not remote or speculative, but is actual and imminent'"), quoting, Sierra Club v. Larson, 769 Fed. Supp. 420, 422 (D. Mass. 1991).  Plaintiffs' failure to demonstrate "imminent irreparable harm" is a proper and appropriate basis to deny its motion.  Cote-Whitacre

---

[12] See Ronca, Shirley, and Fleming Aff.
[13] Attached as an exhibit to the Complaint.
[14] See Ronca and Henkart Aff.

v. Dep't of Pub. Health, 446 Mass. 350, 357 (2006).   See also Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (ruling that a finding of irreparable harm must be "grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."); Bonderman v. Naghieh, 2005 WL 1663469, *4, No. 310980 (Mass. Land Ct. July 18, 2005) (Piper, J.) (denial of a motion for preliminary injunction is appropriate when the purported harm is not imminent); Rubacky v. Morgan Stanley Dean Witter Credit Corp., 104 Fed. Appx. 757, 758 (1st Cir. 2004).

Plaintiff's delay is terminal for its requested relief.   The case of Exeter Group, Inc. v. Sivan, 2005 WL 1477735, C.A. No. 2005-0628- BLS2 (Mass. Super. Mar. 24, 2005) (Burnes, J.) is instructive in this regard.   In that action, the plaintiff alleged that it would suffer irreparable harm because the defendant stole its trade secrets and went to work for another company in violation of a non compete agreement.   Id. at *1. The plaintiff first learned that the defendant went to work for another company in late 2004, but delayed in commencing the action and seeking a preliminary injunction until February 2005. Id. at *6.   The Court denied the plaintiff's motion for preliminary injunction as a result of the delay and explained its reasoning as follows:

> [Plaintiff's] delay in bringing this action for injunctive relief weighs against its allegation of irreparable harm. See Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488, 495-96 (1986) ("Unexplained delay in seeking relief for allegedly wrongful conduct may indicate an absence of irreparable harm and may make an injunction based upon that conduct inappropriate"). [Plaintiff's agent] acknowledged that the first time that [plaintiff] learned that [defendant] was working at [competing company] was in late 2004, and this action was filed on February 7, 2005. [Plaintiff's] lack of urgency in bringing suit belies its contention that it will be irreparably harmed if a preliminary injunction does not issue.

Id.

As little as a six-month delay between the alleged wrongdoing and attempt to obtain a preliminary injunction can warrant denying a request for injunctive relief.   See Yarde Metals, Inc. v. New England Patriots Ltd. P'ship, 2003 WL 22304072, *8, C.A. No. 03-3832 (Mass.

Super. Sept. 26, 2003) (Sikora, J.) aff d, 64 Mass. App. Ct. 656, 834 N.E.2d 1233 (2005) (noting that a six month "delay in the pursuit of injunctive relief tends to subtract from the urgency and irreparability of the claimed injury."); see also Bergeron v. Ridgewood Elec. Power Trust V, 2007 WL 1057004, *2, C.A. No. 07- 1205BLS1 (Mass. Super. Mar. 26, 2007) (van Gestel, J.) (denying request for injunction concerning distribution from sale of company on other grounds, but noting that a "delay of a month and one-half in seeking injunctive relief is surprising to this Court.").

In this case, Plaintiff waited over a year following the departure of Messrs. Ronca, Shirley and Fleming and their joining Red Lambda before filing this action.  In the interim, seven additional employees left to seek "greener pastures" and perceived better opportunity at Red Lambda.  Certainly, Arbor's inaction against their former colleagues, who went to work for Red Lambda a year earlier, signaled to more recent employees, what they already knew, Arbor and Red Lambda were not competitors.  Plaintiff's failure to file a timely claim signaled all the other Defendants that there was no violation of any Arbor non-compete agreements by going to work for Red Lambda in a different product space.

    2.    <u>The Potential Harm to Red Lambda Significantly Outweighs that to Arbor</u>.

Plaintiff's motions effectively seeks to place at least seven of Red Lambda's employees out of work, devastating not only these employees' ability to earn a living and the families that rely on them as  breadwinners.  See, e.g., Banner Indus. v. Bilodeau, No. CIV.A. 3-236-C, at *2 (Mass. Super. Ct. Feb. 27, 2003) ("there is evidence suggesting that a legal framework that promotes low employee mobility by strict enforcement of non-compete agreements may have an adverse economic impact on a region"); Neeco, Inc. v. Computer Factory, Inc., No. 87-1921-Z, 1987 WL 16161, at *3 (D. Mass. Aug. 19, 1987) (noting that "[t]he risk to plaintiff from [a

former employee] working for its competitor is far less than the injury to [that employee] from having to give up entirely her new found job"); (See, e.g., Henkart Aff. ¶ 33; Shirley Aff. ¶¶ 30-31; Porter Aff. ¶ 38; Scanlon Aff. ¶¶ 50-52; McEachin Aff. ¶¶ 25-27; Gill Aff. ¶¶ 32-33; Ronca Aff. ¶ 43.)

"[P]laintiff's interest in enforcing specific performance of its employment contracts . . . does not outweigh the defendants' interests in pursuing and obtaining gainful employment up to their full earning capacity." Lucent Techs., Inc. v. Tymann, 106 F. Supp. 2d 189, 191 (D. Mass. 2000).   Rather, the employees' interest in earning a living and supporting their families far outweighs Plaintiff's "speculative interest in protecting its investment in its employees, or its monetary interest in stifling adverse competition." Banner Indus., No. CIV.A. 3-236-C, at *4 (noting that "the right to work and support his family is the most important right the [individual employee] possesses).

The harm resulting from the proposed temporary restraining order and preliminary injunction would not only be felt by the Individual Defendants, but by Red Lambda as well.  The Individual Defendants are current employees of Red Lambda presently engaged in a productive capacity for the company.   Issuing an injunction forcing these employees to cease working would seriously disrupt Red Lambda's business operations.  See, e.g., Packaging Indus. Grp., Inc. v. Cheney, 405 N.E.2d 106, 114 (Mass. Super. Ct. May 9, 1980) (finding that the judge could well have concluded that risk of granting a preliminary injunction that "would most seriously disrupt and probably wipe out defendant's business" tipped the balance of harm in favor of denial).  "Normally the aim of preliminary relief is to preserve the status quo until the parties' legal rights are sorted out." Tom's Gourmet, Inc. v. Northboro Commons, LLC, No.

200603110C, 2006 WL 696477, at *1 (Mass. Sup. Ct. March 1, 2006).  Here, Plaintiff wants to upset the status quo in its favor, without offering any compensation or sufficient justification.

Plaintiff complains about the loss of a portion of its sales force and the associated amounts Plaintiff invested in training and developing client bases for each.  (Dkt. 7-1 at 5, 12). Regardless of the Court's ruling on these motions, one thing is certain, these employees will not be coming back to work at Arbor.  See, e.g., Edwards v. Athena Capital Advisors, Inc., No. 072418E, at *4 (Mass. Sup. Ct. Aug. 9, 2007) (finding that the former employee's interest in earning a living outweighs the former employer's "speculative interest in protecting its investment in training its employees, or in avoiding adverse competition").  Plaintiff "must establish injury that is not remote or speculative, but is actual and imminent."  Exeter Grp., Inc. v. Sivan, No. 20050628BLS2, 2005 WL 1477735, at *6 (Mass. Sup. Ct. March 24, 2005).[15]

Here, because the potential harm to Defendants outweighs that posed to Plaintiff, Plaintiff's motions should be denied.  See, e.g., Banc of Am. Corporate Ins. Agency, LLC v. Verille, No. CV2007-01099, at *3 (Mass. Super. Ct. Aug. 6, 2007) (harm to employee outweighed potential harm to "a major corporation with a significant client base[,]" considering the impact on the employee and his "interests in pursuing his livelihood" in a career he had practiced both before and after his period of employment with the former employer).

### B.    Arbor is Not Likely to Succeed on the Merits

Arbor is unlikely to succeed on the merits on either of its claims asserted against Red Lambda, Count IV – Intentional Interference with Contractual Relations and Count V – Violation of Mass. Gen Laws. C. 93A.  Both claims are premised upon the alleged breach of certain non-compete agreements by the Individual Defendants.  These claims fail because (1) the

---

[15] Despite these assertions, Plaintiff concedes that it "would be amenable to the Individual Defendants working for Red Lambda in non-competitive positions[.]"  (Dkt. 7-1 at 25.)  Defendants do not work for Red Lambda in a competitive capacity, as explained in Part II(a)(ii) below.

non-competition agreements at issue are unenforceable, (2) even if they were enforceable, the agreements were not breached because Arbor and Red Lambda are not competitors, (3) the Intentional Interference Claim is not supported by the facts of this case, and (4) the Chapter 93A claim fails as a matter of law.

### 1.     The Non-Competition Agreements are Unenforceable.

#### a.     Changes in the Individual Defendants' Circumstances Rendered their Employment Agreements Unenforceable.

None of the Individual Defendants are currently bound by a non-competition agreement with Arbor.  Several of these defendants' agreements have expired by their own terms, and the remainder of the Individual Defendants' agreements were unenforceable even before those employees resigned from Arbor.  It is well settled under Massachusetts law that a change in the relationship between an employer and an employee requires the renewal or replacement of a non-compete agreement entered into in connection with the original relationship. See e.g., F.A. Bartlett Tree Experts v. Barrington, 353 Mass. 585, 587-588 (1968) ("The conduct of the parties … is inconsistent with an intention that the [original] contract be continued in effect.").  Despite material changes to nearly all aspects of the Individual Defendants' employment with Arbor after the agreements at issue were executed, Arbor failed to renew or replace these agreements.[16]

In F.A. Bartlett Tree, the employee signed a non-compete provision at the time of his hiring. Twice during his tenure with the company, the employee's sales territory and compensation changed.  Id.  His job duties also changed.  Id.  In refusing to enforce the original non-compete, the Supreme Judicial Court held that "[s]uch far reaching changes strongly suggest that the parties had abandoned their old agreement and had entered into a new relationship."  Id.

---

[16] It should be noted that, unlike the other Individual Defendants, Mr. Ronca entered into a new non-competition agreement as part of the separation agreement executed at the time he left Arbor's employment.  (Ronca Aff.)  However, that agreement expired, by its own terms, on February 8, 2012.

Courts have repeatedly relied on the foregoing principle in refusing to enforce non-competes. Lycos, Inc. v. Jackson, 2004 WL 2341335, at *9-10 (Mass. Super. Ct. Aug. 25, 2004) (Houston, J.) (changes in salary, bonus eligibility, job responsibilities, title, and direct reports were sufficient to void employment contract); AFC Cable Sys., Inc. v. Clisham, 62 F.Supp.2d 167, 172-73 (D. Mass. 1999) (non-compete not enforced where employee's authority, job title, and pay structure changed); Grace Hunt IT Solutions LLC v. SIS Software LLC, 29 Mass. L. Rptr. 460 (Mass. Super Ct. Feb. 14, 2012) (denying preliminary injunction where change in compensation plan without a new employee agreement amounting to a 20% cut in base salary but adding bonus pay if billable hours targets were met); Cypress Grp. Inc. v. Stride & Assoc., Inc., 17 Mass. L. Rptr. 436, 2004 WL 616302, *2 (Mass. Super Ct. Feb. 11, 2004) (denying preliminary injunction where employees changed job title and regional office without a new agreement).

Moreover, changes to an employment relationship requiring a new employment agreement need not be drastic or negative to void a non-compete agreement.  "[I]t is the existence of a material change in the relationship that voids the prior non-compete agreement, not the nature of the change."  Grace Hunt IT Solutions LLC, 29 Mass. L. Rptr. 460, *5.  In Grace, the employer argued that the employees may actually have *better* fringe benefits under the new compensation structure than the old compensation system; which is a distinction without a difference under Massachusetts law.  Id.  Material changes necessitating a new employment agreement have been found to include changes to the employee's compensation and benefit structure (Grace Hunt IT Solutions; Lycos, Inc.); changes in job titles and responsibilities (F.A. Bartlett; AFC Cable Systems; Lycos Inc.; Cypress Group Inc.*);* and even the sales region (F.A. Bartlett; Cypress Group Inc.).  Other than Mr. Ronca, each of the Individual Defendants in this

case experienced material changes to their compensation and benefit structure, changes in job titles and responsibilities, and, in many cases, changes in sales territory as well years after executing the agreements Arbor here seeks to enforce.

After the agreements at issue were executed, the job title, compensation, and job duties materially changed for the various employees as is reflected in their affidavits.  As in Bartlett, "[s]uch far reaching changes strongly suggest that the parties had abandoned their old agreement," thereby rendering it unenforceable.  F.A. Bartlett Tree Experts, 353 Mass. at 587-588; see also Cypress Grp. Inc. v. Stride & Assoc., Inc., 2004 WL 616302, *2 (Mass. Super Ct. Feb. 11, 2004) (denying preliminary injunction where employees changed job title and regional office without a new agreement).

b.     The Employment Agreements are
Unenforceable Under Colorado Law

Moreover, as set out in more detail the Individual Defendants' Response in Opposition to Plaintiff's Motions, which discussion is expressly incorporated herein, the non-compete agreements executed by those defendants who reside in Colorado – Hollyman, Scanlon, Porter, and Henkart – are further unenforceable as they are contrary to Colorado's strong public policy against the enforcement of such covenants.  Colorado law should be applied to each of these agreements, and Colorado law prohibits non-competition agreements by statute.  See Bi-Rite Enterprises Inc. v. Bruce Miner Co. Inc., 757 F.2d 440, (1st Cir. 1985) (applying the law of various states in which individual parties lived); see also Roll Sys. Inc. v. Shupe, 1998 WL 1785455, *2 (D. Mass. 1998) (applying California law in a non-compete case where the employee lived and worked in California and the contract was performed outside of Massachusetts); Colo. Rev. Stat. §8-2-113 ("Any covenant not to compete which restricts the

14

right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void …").

c. <u>The Worldwide Geographic Scope of the Non-Competition Agreements is Unreasonable</u>.

The crux of Arbor's claim against Red Lambda for intentional interference with contractual relations is that Red Lambda allegedly knew or should of known of the purported non-compete agreements in the Individual Employees' contracts with Arbor, yet hired them anyway.[17]

Under Massachusetts law, a non-compete agreement is only enforceable to the extent necessary to protect the employer's legitimate business interests. <u>Novelty Bias Binding Co. v. Shevrin</u>, 342 Mass. 714, 716 (1961). Non-compete agreements must also be reasonably limited in time and geography. <u>All Stainless, Inc. v. Colby</u>, 364 Mass. 773, 778 (1974). Arbor's non-compete agreement fails each of those tests.

Courts in Massachusetts and across the country have unanimously rejected non-compete agreements with a worldwide scope as plainly overbroad and unenforceable. <u>Edwards v. Athena Capital Advisors, Inc.</u>, 072418E, 2007 WL 2840360 (Mass. Super. Aug. 9, 2007) (awarding *employee* preliminary injunction against enforcement of non-compete, holding "[t]his covenant, if enforced on its own terms, would preclude Edwards from any work in the financial services industry throughout the world for one year. That poses clear irreparable harm to Edwards' future career."); <u>Kenyon Int'l Emergency Services, Inc. v. Malcolm</u>, CIV.A H-09-3550, 2010 WL 452745 (S.D. Tex. Feb. 8, 2010) <u>aff'd</u>, 400 F. App'x 893 (5th Cir. 2010) (refusing to enforce

---

[17]   As shown below, the allegations that Red Lambda's employees were hired with knowledge that their hiring would be a breach of their employment contracts fails to state a claim for intentional interference with contractual relations under Massachusetts law. Simple knowledge does not establish the essential element of an "improper means or motive." <u>United Truck Leasing Corp. v. Geltman</u>, 406 Mass. 811, 817 (1990).

worldwide non-compete); <u>Silipos, Inc. v. Bickel, 2006 WL 2265055, *6 (S.D. N.Y. 2006)</u> (a restrictive covenant with **worldwide** restrictions on competition is not reasonable); <u>Garfinkle v. Pfizer, Inc., 162 A.D.2d 197, 197, 556 N.Y.S.2d 322, 323 (1st Dep't 1990)</u> (refusing to enforce a restrictive covenant whose **geographic scope** "encompasses the entire world").

Arbor all but concedes the inevitable by inviting the Court to "blue pencil" the geographic scope of the non-compete agreement. Setting aside the fact that Arbor has presented no evidence on which the Court could fashion a more reasonable geographic scope—which precludes injunctive relief—the "blue pencil" option is not limitless. <u>Hurwitz Group, Inc. v. Ptak</u>, CIV. A. 02-2599, 2002 WL 32717868 (Mass. Super. June 27, 2002) ("While blue-penciling is permissible within reason, and is expressly invited by subsection (c) of the above-quoted section 4, there is a point beyond which it is unreasonable to expect the parties to submit themselves to the post-hoc judgment of a court of equity, as a substitute for their own bargain.") (citation omitted). In this case, the absence of any geographic or other constraints related to Arbor's legitimate business interests mean that "blue penciling" would involve the Court essentially drafting a new agreement from scratch, which the Court should decline to do.

**2.      Even if the Agreements Were Enforceable,
the Products Are Not Competitive.**

Where, as here, a non-competition agreement does not define what companies are "competitive," or what is meant by the word, Massachusetts courts have looked to whether the products or services are exclusive, i.e. whether a customer would likely buy one, but not both. <u>See</u> <u>Lombard Medical Technologies, Inc. v. Johannessen</u>, 2010 WL 2682449 (D. Mass. July 2, 2010). "[W]hat makes products competitors is that they seek to fill a common need." <u>Id.</u> at *6. "Two companies 'are in direct competition not because they manufacture identical products, but because a consumer … would turn only to one of [them] … to solve its problems." <u>Id.</u> In

deciding that the products sold by the parties in <u>Lombard</u> were competitive, the court noted that "[p]urchasing both of these products would not be a sensible third course." <u>Id.</u> (quoting <u>Cereva Networks, Inc. v. Lieto</u>, 2001 WL 1228040 at *4 (Mass. Super. Ct. Oct. 12, 2001). Here, customers can, and have, purchased both the products of Arbor and Red Lambda. (Henkart Aff.). It is further notable that at least one Red Lambda customer purchased Arbor's product *after* it purchased Red Lambda's. <u>Id.</u>

Arbor and Red Lambda are both part of the broad "IT Security Market." However, Arbor and Red Lambda belong to entirely different sub-markets with completely different products. Individual business customers attempting to protect their computer systems buy both (1) Directed Denial of Service ("DDoS") protection, like Arbor's, and 2) Big Data artificial intelligence, like Red Lambda's to protect against different risks. (<u>Id.</u> ¶ 21.) The products are not substitutes for one another. They provide different services and do not compete in the same markets. (<u>Id.</u>) Because there are numerous ways in which the security of a network can be compromised, there are numerous companies offering solutions to address particular security issues. (<u>Id.</u> ¶ 22.) A well-secured network typically has dozens of security systems provided by different vendors, each addressing particular threats. (<u>Id.</u> ¶ 23.)

Arbor provides DDoS flow based detection and mitigation. (<u>Id.</u> ¶¶ 15, 26.) Arbor sells only two products, Peakflow and Pravail, both of which provide a solution to DDoS threat. (<u>Id.</u> ¶ 24.) Arbor's products are appliance-based, i.e. a piece of electronic hardware, with pre-loaded software, that is physically installed on a customer's network. (<u>Id.</u> ¶ 25.) The Arbor products also perform what is known as visibility, security, and analysis on flow-based[18] structured data[19] to identify certain specific types of malware (malicious software that infects a computer), to

---

[18] "Flow-based" refers to a record of traffic that flows across a network.
[19] "Structured data" is data that has a pre-defined format.

identify DDoS attacks, and to measure the amount of traffic between different points in, from, or to a network.  (Id. ¶ 26.)

Red Lambda's product does not provide a DDoS solution.  (Id. ¶ 21.)  Instead, Red Lambda competes in the Big Data artificial intelligence security market.  (Id. ¶¶ 21, 28.)  The term Big Data refers to large amounts of complex structured, unstructured, and binary data.  (Id. ¶ 27.)  MetaGrid, Red Lambda's only product, provides a solution to the problem of analyzing Big Data.  (Id.)  MetaGrid is a software platform that enables distributed supercomputing[20] to analyze Big Data and uses Artificial Intelligence (AI) to perform automated data mining to find unique events buried in large amounts of varied types of data without any signatures or rule configurations.  (Id. ¶ 28.)

The Arbor and Red Lambda products cannot be used interchangeably and are not substitutes for one another.  (Id. ¶ 31.)  The business customers to which both seek to market, want to buy a product in both the DDoS space and the Big Data space, not one or the other.  (Id. ¶ 21.)

These products do not fill a "common need."  See Lombard Medical Technologies, Inc. v. Johannessen, 2010 WL 2682449 at *6 (D. Mass. July 2, 2010) ("[W]hat makes products competitors is that they seek to fill a common need.")  Customers do not select between the two. (Henkart Aff.)  Customers will want to purchase both big data and DDoS mitigation products to protect against different threats.  (Id. ¶¶ 21, 23.)

>   **3.**      **There is No Basis For an Intentional Interference Claim**.

Arbor is not entitled to injunctive relief on its Intentional Interference claim.  As a threshold matter, as described above, Red Lambda is not a competitor of Arbor, and thus none of

---

[20] Distributed supercomputing means that the computing function can be shared between any number and numerous types of computers (including notebooks, tablets, smartphones, desktops, servers) on any network on the internet.

the Individual Defendants stand in breach of their non-compete agreements. In Telectronics, Inc. v. Downing, 1987 WL 9904, *3 (D. Mass. Apr. 6, 1987), the district court found that the non-compete agreement was unenforceable and, as a result, concluded that "plaintiff has alleged no wrongful act or means on the part of [the competitor] which constituted the alleged interference with Telectronics' relationship with [the employee]." Id. at *4. In similar fashion, because the Individual Defendants have not breached their agreements with Arbor (i.e., the predicate for Arbor's claim for tortious interference against Red Lambda has not been satisfied), Arbor has not established a likelihood of success on the merits of its tortious interference claim against Red Lambda.

Further, there is nothing extraordinary about Count IV that warrants the imposition of a temporary restraining order or preliminary injunction. See, e.g., Entm't Publications, Inc. v. Goodman, 67 F. Supp. 2d 15, 20 (D. Mass. 1999) (court declined to "impose injunctive relief, as there remains an adequate remedy at law . . . [for] tortious interference with advantageous contractual relations."). In this case, there is an adequate remedy at law, namely, monetary damages, thereby obviating any need for injunctive relief on this count.

As a substantive matter, Arbor is not likely to prevail on its claim of intentional interference against Red Lambda because it has not alleged conduct that satisfies all of the elements of such a claim. Arbor has the burden of establishing, inter alia, that (1) Arbor knowingly induced the Individual Defendants to break their contracts and (2) that Red Lambda's alleged interference was improper in motive or means. See Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 476 (1992).

First, Arbor's contention that Red Lambda knowingly induced the Individual Defendants to work for Red Lambda in violation of their prior employment agreements is based on

speculation that, "because . . . the Danaher Agreements required [Ronca, Scanlon, and Hollyman] to share the agreement with any subsequent employers. . . . Red Lambda knew or should have known that the remaining Individual Defendants had executed similar agreements." Arbor's Memorandum, p. 25.   As provided in the attached affidavit of David Carter, Red Lambda was unaware of the terms, and had not received copies of, the Danaher or Arbor Agreements from the Individual Defendants before their employment with Red Lambda. Without Red Lambda's knowing inducement of the Individual Defendants to breach their agreements with Arbor, there can be no tortious interference by Red Lambda.

Second, assuming, *arguendo*, that Arbor could establish that Red Lambda knowingly induced the Individual Defendants to breach their agreements (which Arbor cannot and Red Lambda did not), Arbor would still not be likely to prevail on its claim for intentional interference because it has not satisfied its burden of demonstrating that Red Lambda's alleged interference was improper in motive or means.   In the Complaint, Arbor alleges that Red Lambda "knew or should have known" that the Individual Defendants' work for Red Lambda and alleged solicitation of Arbor's customers would constitute breaches of the Danaher and Arbor Agreements.   (Complaint, ¶¶ 170, 171.)   Those speculative allegations, at most, relate to whether Red Lambda knowingly induced the Individual Defendants to breach their agreements. They do not, as Arbor alleges, establish that "Red Lambda had an improper motive and used improper means in interfering with Arbor's contractual and/or advantageous business relations." (Complaint, ¶ 172.)   Arbor's conclusory allegation that "Red Lambda had an improper motive and used improper means" (repeated in Arbor's Memorandum, p. 26) is not supported by any relevant allegations or evidence.

> The Massachusetts Appeals Court has repeatedly stated that evidence of improper purpose or improper means is necessary to establish a tortious interference claim.

. . .

> Because the defendant's purpose was the legitimate advancement of its own economic interest, that motive is not "improper" for purposes of a tortious interference claim. *See Hunneman Real Estate Corp. v. Norwood Realty, Inc.*, 54 Mass. App. Ct. 416, 428-429, 765 N.E.2d 800 (2002). That the plaintiff may have suffered a loss as a consequence of the defendant's pursuit of its own interest is a by-product of a competitive marketplace; it does not render the defendant's effort tortious.

Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B., 62 Mass App. Ct. 34, 38-39 (2004); see also United Truck Leasing Corp. v. Gellman, 406 Mass. 811, 816 (1990) (improper motive or improper means must be established in order to prove a cause of action for intentional interference with contract or prospective contractual relationship).

In TalentBurst, Inc. v. Collabera, Inc., 567 F. Supp. 2d 261, 263 (D. Mass. 2008), the plaintiff claimed that the defendant corporation tortiously interfered with its contractual relations by hiring one of its former employees who was subject to a non-compete agreement. However, the plaintiff in TalentBurst, Inc. failed to allege that the defendant corporation used improper means "– such as making fraudulent statements or threats – to induce [the employee] to leave TalentBurst." Id. at 269. Instead, the complaint indicated that "all [the defendant corporation] did was perhaps to recruit [the employee] and then offer him a job." Id. The court rejected this as a basis for a claim of tortious interference, because "Massachusetts courts . . . have held that the offering of a job to a competitor's at-will employee, including one that provides better pay and benefits, does not as matter of law constitute improper means." Id. (citing Perishables By Air, Inc. v. OceanAir, Inc., 68 Mass. App. Ct. 1110 (2007)). Similarly, "[p]ursuit of a legitimate business interest, without more, fails to qualify as an improper means or motive in analyzing the elements necessary to support a claim for interference with contract." Synergistics Tech., Inc. v. Putnam Investments, LLC, 74 Mass. App. Ct. 686, 690 (2009) (ruling that defendant corporation

had a right to hire plaintiff's former consultants if it chose to do so regardless of plaintiff corporation's claims against them "or any contractual rights to their fealty.").

Like the plaintiffs in <u>TalentBurst</u>, and <u>Synergistics</u>, Arbor has failed to demonstrate, through its Complaint or otherwise, that Red Lambda acted with improper means or motive in hiring the Individual Defendants. Accordingly, Arbor is not likely to prevail on the merits of its claim for tortious interference against Red Lambda and its motion for injunctive relief should be denied on this basis. See <u>Lombard Med. Technologies, Inc. v. Johannessen</u>, 729 F. Supp. 2d 432, 441 (D. Mass. 2010) (without evidence to demonstrate that defendant corporation induced plaintiff's former employees to breach their non-compete agreements or evidence demonstrating that defendant corporation had an improper motive or used improper means, plaintiff cannot demonstrate a likelihood of success on claim for tortious interference).

### 4.    The Alleged M.G.L. c. 93A Claim Fails as a Matter of Law

Arbor is not likely to prevail on its claim that Red Lambda violated M.G.L. c. 93A, §§ 2 and 11, because (a) a claim for tortious interference cannot be used to support a claim for violation of Chapter 93A; and (b) the alleged conduct that forms the basis of Arbor's Complaint did not occur "primarily and substantially within the Commonwealth of Massachusetts," as required by the statute.

a.    <u>Arbor Is Not Likely To Prevail On Its Chapter 93A Claim Because Intentional Interference With Contractual Relations Is Not Actionable Under Chapter 93A</u>

In support of Arbor's claim against Red Lambda for violation of Chapter 93A, Arbor expressly relies on its claim that Red Lambda "tortiously interfered with Arbor's contractual relationships." Complaint, ¶ 181; Plaintiff's Memorandum, pp. 26-27. However, Arbor's reliance is misplaced because tortious interference cannot serve as the basis for a Chapter 93A

claim.  Generally, to prevail on a Chapter 93A claim, a plaintiff must show that it suffered a loss as a result of the defendant's "unfair method of competition or an unfair or deceptive act or practice," while engaged in trade or commerce.  Mass. Gen. Laws. Ch. 93A, § 2 and 11. However, it is well-settled under Massachusetts' law that disputes between employers and employees, including disputes over violations of a restrictive covenant, fall outside of the scope of M. G. L. c. 93A because employment agreements do not constitute either "trade" or "practice" under the statute.  See, e.g., Manning v. Zuckerman, 388 Mass. 8, 14 (1983); Informix v. Rennell, 41 Mass. App. Ct. 161 (1996).

Further, in factual circumstances virtually identical to the instant case, Massachusetts federal and state courts have held that a former employer's intentional inference claim against a new employer based on the latter's alleged encouragement to an employee to breach a non-compete agreement cannot, as a matter of law, serve as the predicate for a Chapter 93A claim by the former employer.  TalentBurst, Inc., 567 F. Supp. 2d 261; Intertek Testing Services NA v. Curtis-Strauss LLC, 2000 WL 1473126, at *11-12 (Super. Ct. Aug. 8, 2000).  Therefore, in the instant case, even if Arbor's tortious interference claim were viable, which Red Lambda denies, it cannot serve as the basis for a Chapter 93A claim against Red Lambda.  See id.

In Intertek Testing Services NA, Intertek brought suit against four of its former employees and a rival company alleging, among other things, that the former employees violated their non-compete agreements and that the new employer intentionally interfered with the former employees' contractual relations with Intertek in violation of Chapter 93A.  2000 WL 1473126, at *1.  The Intertek court dismissed the Chapter 93A claim against the new employer on summary judgment, holding that the tortuous interference claim against the new employer based on employment agreements was not actionable under Chapter 93A.  Id. at *11-12.  The Intertek

court reasoned that "[i]f the actual willful breach of a non-compete agreement by an employee is not actionable under c. 93A because the claim arose from the employment relationship, then the conduct of a third party to induce such a breach must also not be actionable because this claim, too, arose from the employment relationship." Id. at *11.

Similarly, in TalentBurst, Inc., the former employer TalentBurst brought a Chapter 93A claim against the new employer, Collabera, based on Collabera's alleged tortious interference with TalentBurst's relationship with its former employee.   The Court granted new employer Collabera's motion to dismiss the Chapter 93A claim, holding "that a chapter 93A [claim] cannot, as a matter of law, derive from a tortious interference claim in these circumstances." Id. at 270-71.

With facts and claims extraordinarily similar to those in both Intertek and TalentBurst, Arbor's claim that Red Lambda allegedly intentionally interfered with Arbor's relationship with its former employees is not actionable under Chapter 93A.[21]

        b.     <u>Arbor Cannot Prevail On Its Chapter 93A Claim Because The Alleged Conduct That Forms The Basis Of Arbor's Complaint Did Not Occur "Primarily And Substantially Within The Commonwealth Of Massachusetts"</u>

Arbor cannot prevail on its Chapter 93A claim for the separate and independent reason that the alleged conduct forming the basis of its claim did not occur "primarily and substantially within the Commonwealth of Massachusetts" as required by the statute.

Chapter 93A, § 11, provides:

... [A]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an

---

[21] Arbor fails to present any persuasive authority to contradict the clear holdings of Intertek and TalentBurst, and instead relies on two cases, Melo-Tone Vending v. Sherry, Inc., 39 Mass. App. Ct. 315, 320 (Mass. App. Ct. 1995) and Cambridge Internet Solutions, Inc. v. Avicon Group, 1999 WL 959673 (Mass. Super. 1999), both of which predate Intertek and TalentBurst. See TalentBurst, 567 F. Supp.2d at 261; Intertek, 2000 WL 1473126.

unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court ...

*[N]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.* For purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

(Emphasis added.)

Thus, according to the express language of the statute, a Chapter 93A claim cannot be maintained when a defendant's conduct occurred mostly in other jurisdictions. Id. In order to determine whether circumstances giving rise to a claim occurred "primarily and substantially" in Massachusetts, Massachusetts courts examine the "center of gravity" of the allegedly unfair and deceptive conduct. Uncle Henry's, Inc. v. Plaut Consulting Co., Inc., 399 F.3d 33, 44 (1st Cir.2005) citing Kuwaiti Danish Computer Co. v. Digital Equipment Corp., 438 Mass. 459, 473 (2003). It is not sufficient that a plaintiff sustained injury in Massachusetts as a result of the deceptive trade practices. Goldstein Oil Co. v. C. K Smith Co., 20 Mass. App. Ct. 243, 479 (1985) (if the place of injury was the test, "it would effectively have eliminated the 'primarily and substantially' exemption in most situations, as practically every Massachusetts plaintiff would suffer injury within the Commonwealth") (abrogated on other grounds by Kuwaiti Danish Computer Co., 438 Mass. 459); see also Kuwaiti Danish, 438 Mass. At 473 (the focus is on the circumstances "that *give rise* to the claim") (emphasis added).

In the present case, Arbor pleads only the legal conclusion that "[t]he conduct constituting violations of M.G.L. c. 93A occurred primarily and substantially in Massachusetts." Complaint, ¶ 179. There are no factual allegations of any kind supporting Arbor's conclusory assertion. Indeed, to the contrary, the facts show that the Defendants' alleged conduct that forms

the basis of Arbor's clams occurred outside of the Commonwealth:  The Individual Defendants were all interviewed by Red Lambda outside of Massachusetts; Red Lambda's employment agreements with the Individual Defendants were all negotiated outside of Massachusetts; and all of the Individual Defendants lived in states other than Massachusetts while working for Arbor and Red Lambda.  (See Carter Affidavit).

The fact that Arbor claims to have suffered damages in Massachusetts does not establish that Red Lambda engaged in deceptive practices that occurred "primarily and substantially'" in Massachusetts, particularly when the deceptive practices are allegedly tied to with Arbor's former employees who all live and work in other states New Jersey, New York, Colorado, Florida, and Virginia, but not Massachusetts.  See Healthco Int'l Inc. v. A-Dec, Inc., 1989 WL 104064, *13 (D. Mass. 1989) (denying Chapter 93A claim where the "offensive conduct occurred more without Massachusetts than within"); Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd., 2006 WL 1766434, *12 (D. Mass. June 28, 2006) (no Chapter 93A violation when alleged "communications and planning" occurred out-of-state and infringement occurred in several states, including Massachusetts); (Carter Aff.).

It is not sufficient for assigning liability under Chapter 93A that Red Lambda transacts business nationally, as the focus of this Court's analysis is whether Massachusetts is "the center of gravity of the circumstances that gave rise to the [93A] claims."  Kuwaiti Danish Computer Co., 438 Mass. at 473. See Henry v. Nat'l Geographic Soc'y, 147 F. Supp. 2d 16 (D. Mass. 2001) (dismissing action brought by Massachusetts photographer against national magazine for use of photographs without permission, finding injury in Massachusetts insufficient).  Because the center of gravity of the circumstances alleged against Red Lambda in the Complaint did not occur in Massachusetts, Arbor's Chapter 93A claim fails as a matter of law.

V.      **Conclusion**

The Plaintiff's delay of a year and a half before coming to Court to enforce a set of non-compete agreements all of which are either expired or void and are not violated nonetheless as Arbor and Red Lambda are not competitors.   The continued employment of these individuals does not indicate the type of emergency warranting the extraordinary remedy of a temporary restraining order or preliminary injunction.   In addition, the Plaintiff is unlikely to prevail on its two claims against Red Lambda.   Tortious interference or M.G.L. c. 93A.   Finally, Arbor is not likely to suffer imminent, irreparable harm by these former employees continuing to work for Red Lambda as they have already left Arbor's employment.   On the other hand, the harm to the individual defendants, their families and Red Lambda would be significant should the Court grant the requested relief based on the unsupported conjecture of the Plaintiff.   Accordingly, Defendant, Red Lambda, Inc., respectfully requests the Court to deny the requested relief of a temporary restraining order or preliminary injunction.

Respectfully submitted,

RED LAMBDA, INC.

By its attorneys,

*/s/ Thomas A. Dye*
**CARLTON FIELDS, P.A.**
Thomas A. Dye, Esq.,
Florida Bar No. 335207
*Admitted pro hac vice*
CityPlace Tower
525 Okeechobee Blvd., Suite 1200
West Palm Beach, Florida 33401
Telephone: (561) 659-7070
Facsimile: (561) 659-7368
Email: tadye@carltonfields.com

**BECK REED RIDEN LLP**
Russell Beck (BBO # 561031)
Stephen D. Riden (BBO # 644451)
155 Federal Street, Suite 1302
Boston, MA 02110
Telephone: (617) 500-8660
Facsimile: (617) 500-8665
Dated:  July 26, 2012                         Email: sriden@beckreed.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing and paper or electronic copies will be delivered to those indicated as non-registered participants on July 26, 2012.

*/s/  Stephen D. Riden*
STEPHEN D. RIDEN

# Exhibit A

BOSTON SOFTWARE SYSTEMS, INC. vs. PAMELA DOHERTY & another.[1]

CIVIL ACTION NO. 07 1059 BLS1

MEMORANDUM AND ORDER ON APPLICATION FOR A PRELIMINARY INJUNCTION

This matter comes before the Court on an application of the plaintiff, Boston Software Systems, Inc. ('BSS'), seeking certain preliminary injunctive relief against the defendants Pamela Doherty ('Doherty') and Summit Healthcare Systems, Inc. ('Summit') (collectively, the 'defendants'). What is involved are rights and obligations arising from an employment agreement with non disclosure and non competition covenants.

In issue is the sale and servicing of certain scripting and software integration and related services to healthcare institutions across the United States. BSS's customers rely on its products and services to provide them with automated solutions to assist in getting their various software packages to work together and share information.

Until 2002, BSS did not sell directly to end users. Rather it engaged Summit as its exclusive sales agent for 'Boston WorkStation,' BSS's core software program.

In 2002, Doherty, then a Summit employee was engaged by BSS. At that time, BSS severed its relationship with Summit and began its own direct sales effort. Doherty was engaged to lead that effort.

Doherty's employment agreement with BSS included, among other things, the following non competition covenant:

Restriction on Competition. Employee agrees that, during his/her term of employment with the Company and for a period of one year after termination for any reason of Employee's employment, (s)he will not, directly or indirectly, render services to, work for or on behalf of, have an interest in, make any loan to, or assist in any manner any business that it competitive with the business in which the Company is engaged or planned to be engaged on the date of Employee's termination from the Company.

Another section of her employment agreement requires Doherty to protect BSS's confidential information and trade secrets.

Doherty was terminated, allegedly for cause, on December 29, 2006. BSS learned on January 30, 2007, that Doherty had returned to, and accepted employment from, Summit. BSS aserts that Summit is one of BSS's primary competitors. Summit is said to sell a script based, application integration and interface development product, primarily or exclusively to healthcare providers. It is said that Summit's 'Summit Scripting Toolkit' and BSS's 'Boston WorkStation' have similar functionality, operate in a similar manner, and are intended to address similar needs.

While Summit argues that it does not heavily compete with BSS, it appears to concede that at least on the sale of some products, as opposed to product servicing, it does.

BSS here seeks preliminary injunctive relief preventing Doherty from working for Summit until at least December 29, 2007.

DISCUSSION

To suggest that the salient facts here are scarcely in dispute would be an overstatement of huge proportion. Between the filing of the complaint and up until shortly after the hearing on the request for injunctive relief, the Court has been buried with 15 separate affidavits, sprinkled about evenly supporting both sides. Those affidavits, in the general order of their filing, are:
(1) Affidavit of Steven M. Cohen; (2) Affidavit of Sara McNeil; (3) Affidavit of James McKinnon; (4) Affidavit of Pamela Doherty; (5) Affidavit of Joseph LaFerrera; (6) Supplemental Affidavit of Steven M. Cohen; (7) Substitute Affidavit of James McKinnon; (8) Substitute Affidavit of Pamela Doherty; (9) Second Substitute Affidavit of Steven M. Cohen; (10) Second Affidavit of Sara McNeil; (11) Affidavit of Robert DiSciullo; (12) Affidavit of Edward Rossi; (13) Second Affidavit of James McKinnon; (14) Second Affidavit of Pamela Doherty: and (15) Affidavit of Julie Titone.

In order to prevail on its request for preliminary injunctive relief, BSS bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to the defendants from their being enjoined. Cabot Corporation v. AVX Corporation, SJC 09857, Slip Op., pp. 11 12 (March 28, 2007); GTE Products Corp. v. Stewart, 414 Mass. 721, 722 723 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616 617 (1980).

Injunctive relief either by way of a temporary restraining order or by a preliminary injunction implicates a

Case 1:12-cv-11322-NMG   Document 35   Filed 07/26/12   Page 31 of 41

power of equity which should be exercised delicately.  It should not be exercised routinely and the court should refuse to grant such relief unless the circumstances require it.

Nolan and Sartario, Equitable Remedies, 31 M.P.S. sec. 139 (1993).

   Protection of a former employer from ordinary competition is not a legitimate business interest, and a covenant designed solely for that purpose will not be enforced.  Richmond Bros. Inc. v. Westinghouse Bdcst. Co., Inc., 357 Mass. 106, 111 (1970).
   The legal history of non competition covenants dates back at least to Lord Macnaughten, in England in the late 19th century.  In Nordenfeldt v. Maxim Nordenfelt Guns & Ammunition Co., [1894] A.C. 535 at 565, he reminded his readers that enforcement of these kinds of covenants is an exception to the general rule when he said:

   The public have an interest in every person's carrying on his trade freely:  so has the individual.  All interference with individual liberty of action in trading, and all restraints of trade themselves, if there is nothing more, are contrary to public policy, and therefore void.  That is the general rule.  But there are exceptions:  restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case.  It is a sufficient justification, and indeed it is the only justification, if the restriction is reasonable - reasonable, that is, in reference to the interest of the parties concerned and reasonable in reference to the interest of the public, so framed and so guarded as to afford adequate protection to the party in whose favour it is imposed, while at the same time it is in no way injurious to the public.  That, I think, is the fair result of all of the authorities.

   Massachusetts adopted Lord Macnaughten's statement at least as early as 1922.  See Sherman v. Pfefferkorn, 241 Mass. 468, 474 (1922).
   The law more recently has been recited as follows:

   A covenant not to compete is enforceable only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest.  See Marine Contrs. Co., v. Hurley, 365 Mass. 280, 287 288 (1974); All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (9174).  Covenants not to compete are valid if they are reasonable in light of the facts in each case.  See Marine Contrs. Co. v. Hurley, supra, at 287; Saltman v. Smith, 313 Mass. 135, 145 (1943).  Historically, covenants not to compete typically have arisen in either the employment context or in the context of the sale of a business.  See, e.g., Whitnsville Plaza, Inc. v. Kotseas, 378 Mass. 85 (1979) (sale of business); Marine Contrs. Co. v. Hurley, supra (employment); All Stainless, Inc. v. Colby, supra, (employment); Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488 (1986) (sale of business). . . .

Boulanger v. Dunkin' Donuts Incorporated, 442 Mass. 635, 639 640 (2004).

   Legitimate business interests include protection of trade secrets, confidential information, and good will.  Marine Contrs. Co. v. Hurley, supra at 287.  A covenant not to compete designed to protect a party from ordinary competition does not protect a legitimate business interest.

Id. at 641.

   The non competition covenant here is reasonably limited in time and space.  Whether, however, it protects a legitimate business interest, as opposed to merely ordinary competition, is less apparent.
   On the present highly contested record, it is not sufficiently established the BSS has carried its burden to show the requisite likelihood of success on the merits in this case.
   Also monetary damages would appear to suffice as relief if there are breaches in this situation.  But '[e]conomic harm alone . . . will not suffice as irreparable harm unless 'the loss threatens the very existence of the movant's business.'  Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 399 Mass. 640, 643 (1987).'  Tri Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 227 228 (2001).  No such threat to BSS has been demonstrated here.
   BSS presses potential loss of good will with its customers.  Good will is a broad term and encompasses a variety of intangible business attributes such as the "name, location and reputation, which tends to enable' the business 'to retain [its] patronage." Slate Co. v. Bikash, 343 Mass. 172, 175 176 (1961).  An employer's positive reputation or position in the eyes of its customers or potential customers is an element of good will.  Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287 289 (1974).
    Good will is also generated by repeat business with existing customers.  Id.  Good will is a legitimate

© 2012, Social Law Library. All Rights Reserved.

business interest that an employer is entitled to protect. Kroeger v. Stop & Shop Co., Inc., 13 Mass. App. Ct. 310, 316 (1982). Here, however, Doherty, when originally at Summit, dealt with many of BSS's customers when Summit was doing the sales work for BSS's products. Presumably, she established relationships with those customers. Thus, the element of whose good will is involved is less than clear.

   Further, on her return to Summit after being terminated by BSS, Doherty, at least for the remainder of the non competition period, will not be dealing directly with any customers. Instead, Doherty's activities will be limited to services activities 'areas of Summit's business that are entirely separate from BSS's market area' and 'to the extent she possesses any confidential matter regarding BSS . . . neither she nor [Summit] will utilize it for Summit's benefit.' See Defendants' Substitute Opposition, Paper #23, at p. 19, wherein the defendants' expressly agree that such limitations may be incorporated in a Court order.

   A total bar on Doherty's employment with Summit is not necessary to protect any legitimate interest of BSS under the factual situation presented to this Court at this time.

### ORDER

   Having heard the parties and reviewed their extensive filings, this Court is not convinced that BSS has carried its burden to show its likelihood of success on the merits; that it will suffer irreparable harm if the broad injunctive relief sought is not granted; or that its harm, without the injunction, outweighs any harm to the defendants from their being enjoined. Consequently, the plaintiff's motion for preliminary injunctive relief is DENIED. This denial, however, is without prejudice to the plaintiff seeking the same or similar relief if, after some discovery, a stronger record can be presented.

   Further, the defendants are advised not to take this ruling as a victory that frees them to improperly utilize the plaintiff's confidential information or for Doherty to improperly contact or solicit the plaintiff's customers for the sale of competing products.

   Still further, this Order is conditioned upon Doherty and Summit complying strictly with their representations that Doherty, at least for the remainder of the non competition period, will not be dealing directly with any customers of BSS, that Doherty's activities will be limited to 'areas of Summit's business that are entirely separate from BSS's market area' and, 'to the extent she possesses any confidential matter regarding BSS, . . . neither she nor [Summit] will utilize it for Summit's benefit' and it shall be returned to BSS or its counsel forthwith.


Allan van Gestel
Justice of the Superior Court

April 3, 2007


-------------------------
   [1] Summit Healthcare Systems, Inc.

# Exhibit B

$|o^{q|}$

$//. ^{o}$

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                    **SUPERIOR COURT**
                                                **No. 08-0747**

### REEBOK INTERNATIONAL, LTD.

#### Plaintiff

v.

#### JOSHUA A. RATTET

#### Defendants

## MEMORANDUM OF DECISION AND ORDER
## ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This is an action seeking to enforce a non competition agreement between the plaintiff
Reebok International, Ltd. ("Reebok") and its former employee, the defendant Joshua Rattet. The
case is before the Court on the plaintiff's Motion for a Preliminary Injunction. After careful
consideration of the materials submitted by both parties, this Court concludes that the Motion
must be **Denied**.

### BACKGROUND

The facts are set forth in the Complaint with attachments, together with the affidavits
submitted both in support of and in opposition to this Motion. They are only briefly summarized
here.

Reebok is in the business of designing, manufacturing and marketing sneakers and
athletic apparel. Rattet has been a full time employee with Reebok since 2002, the last four years
spent in its cleated footwear division. On February 28, 2008, Rattet resigned and accepted a
position with Under Armour, Inc. ("Under Armour"), which only recently entered the market as a

1


RECEIVED & FILED
CLERK OF THE COURTS
NORFOLK COUNTY

competitor to Reebok in athletic footwear. Rattet was due to start work at Under Armour's

cleated footwear division on April 28, 2008. Reebok seeks an order from this Court preventing

Rattet from working for Under Armour, relying on a non competition agreement (the

"Agreement").

The relevant clause of the Agreement that Reebok seeks to enforce states that Rattet will

not, during his employment:

> "directly or indirectly, own, manage, operate, control, invest in, make loans or
> advances to, be employed by, act as an officer, director, agent or consultant for or
> be in any other way connected with any enterprise anywhere in the world which is
> engage in the athletic footwear business, athletic apparel business or any other
> business which competes with Reebok or any of its subsidiaries or affiliates (the
> "Non Competition Requirement").

If Rattet terminated his employment with Reebok, the company in its discretion could extend this

Non Competition Requirement for a period of up to one year. The Agreement further provided

that, if Reebok elected to make such an extension, it would pay Rattet one-half of his base

salary without benefits for that one year period. On February 26, 2008, four days after Rattet

announced his decision to leave the company, Reebok gave him written notice of its intent to

extend the Non Competition Requirement for the full year. His family's medical and dental

benefits were to cease immediately.

Rattet signed the Agreement containing this Non Competition Requirement when he was

hired on May 1, 2002 to a six month internship in Reebok's sports marketing department. At the

time, Rattet was attending graduate school at Northeastern University. His internship was a

temporary position which paid him $25 per hour without benefits. When Rattet finished his

graduate studies, he accepted a full-time position as sports marketing manager with Reebok.

2

Although Reebok stated that his acceptance of the position was contingent on "your signing of our standard employee agreement and non competition agreement," Rattet did not execute any new non competition agreement. When he moved into Reebok's cleated footwear division in 2003, no mention was made of a non competition agreement or of the earlier Agreement that he had signed as an intern. Rattet's duties in the cleated footwear division were significantly different than those that he had undertaken during his internship.

Over the next three years, Rattet moved up within the cleated footwear division, working as senior product planning manager then as a director. Each time that he was promoted, the offer letter referred to "your Reebok Non Competition Agreement." Again, however, Rattet was not asked to (nor did he) sign any new agreement, nor was it clear from these letters that the agreement referenced was the one that he had signed as an intern.

In December 2005, Under Armour solicited Rattet for a position with it. When Rattet informed Reebok of the offer, Reebok agreed to increase his annual salary from $95,000 to $125,000 and promised to include him in a bonus incentive plan if he would stay with the company. Rattet states in his affidavit that no one at that time brought up the Agreement he had signed as an intern or informed him that he could not go to work for Under Armour because of it. Reebok's offer letter (with the increase in salary) again referenced "your Reebok Non Competition Agreement." Neither the offer letter nor any new agreements between Rattet and Reebok were signed, however, despite some conversation that Rattet should do so. Rattet stayed on with the company, paid at the higher salary as the offer letter stated.

In 2007, Reebok made certain organizational changes and moved Rattet from the cleated footwear division into a different product line. Rattet became disaffected with the company,

3

particularly since he was not included in the bonus incentive plan that he believed that he had been promised. He approached Under Armour, and received an offer of employment. Rattet informed Reebok of his decision on February 22, 2008, and met with (among other people) Reebok's CEO Uli Becker. As Rattet recalled it, Becker was "very upset" and told Rattet that he was "going to stick it to me" and would "find me" in Maryland if he accepted a position with Under Armour, which was headquartered there.

After notifying Rattet of its intention to rely on the Non Competition Requirement, Reebok made two payments of half his salary by way of direct deposit into Rattet's bank account. Rattet returned the money. This lawsuit followed.

## DISCUSSION

The principles that this Court applies to this request for a preliminary injunction are well established. As the moving party, Reebok must demonstrate that: a) it has a reasonable likelihood of success on the merits; b) it will suffer irreparable harm if the injunction is denied; and c) such harm outweighs any injury that Rattet will suffer if the injunction is granted. Packaging Industries Group v. Cheney, 380 Mass. 609, 617 (1980). Ultimately, the decision as to whether to use its equitable powers lies within the sound discretion of this Court. Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 218, 219 (2001).

With respect to non competition agreements in particular, a court should exercise its equitable powers to enforce them sparingly, since such covenants restrict an individual's ability to work. Marine Contractors v. Hurley, 365 Mass. 280, 287 (1974). A non competition agreement is enforceable only if the plaintiff shows that it is: a) necessary to protect a legitimate business interest; b) is supported by consideration; c) is reasonably in time and geographical

4

scope; and d) is otherwise consonant with public policy. See All Stainless, Inc. v. Colby, 364

Mass. 773, 778 (1974). The business interests of the employer worthy of protection fall into

three categories: 1) trade secrets; 2) confidential data; and 3) good will. Marine Contractors v.

Hurley, 365 Mass. at 287-289. "A covenant not to compete designed to protect a party from

ordinary competition does not protect a legitimate business interest." Boulanger v. Dunkin

Donuts, Inc., 442 Mass. 635, 641 (2004).

In the instant case, there is some dispute as to whether there was even a valid non

competition agreement in effect between the parties at the time that Rattet made his decision to

resign. The covenant that Reebok seeks to enforce was part of an Agreement that Rattet signed

when he held a temporary position at the company, at an hourly wage with no benefits, with

responsibilities far different and more limited than those he ultimately came to assume. Relying

on F.A. Bartlett Tree Expert Co. v. Barrington, 353 Mass. 585 (1968), the defendant argues that

this material change in the conditions of his employment means that the earlier Agreement is

void as a matter of law.  The plaintiff argues, on the other hand, that the question is not simply

whether the terms of Rattet's employment changed but whether the conduct of the parties

indicated an intent to abandon the original agreement. Reebok contends that its repeated

reference reminding Rattet of " your Reebok Non Competition Agreement" every time a change

was made in the conditions of his employment showed that Reebok continued to believe that the

Agreement survived.

This Court does not find it easy to resolve these arguments, particularly at this

preliminary stage, since the issue is not strictly one of law but also involves disputes of fact.

Although Reebok did, on every occasion that it promoted Rattet, refer to the need to sign a non

5

competition agreement, the fact remains that no new agreement was signed. That the employer

chose to drop the subject and "hope for the best" does not thereby entitle it to rely on the

existence of a binding agreement where, as a result of its own inaction, it failed to obtain one.

See AFC Cablesystems Inc. v. Clisham, 62 F.Supp. 2d 167, 168 (D.Mass. 1999) (refusing to

enforce five year old non competition agreement where there had been material changes in

employment but no new agreement signed).   On the other hand, there is some evidence before

the Court that Rattet understood that he continued to be bound by the Agreement that he signed

as an intern.     At the very least, there is no clear indication that the parties intended to abandon

their original agreement as there was in the Bartlett Tree case, where the agreement sought to be

enforced was 20 years old.

The defendant does not rely only on the Bartlett Tree case, however, in arguing that the

plaintiff has failed to show a reasonable likelihood of success on the merits.   He also argues that

the Non Competition Requirement is overbroad.  This Court is inclined to agree. Although it is

limited in time (one year), it is not limited in any other respect.  Specifically, the Agreement that

Reebok relies upon prevents Rattet) from working in any capacity in the "athletic footwear

business, athletic apparel business or any other business which competes" with Reebok or its

subsidiaries.  This conceivably prevents Rattet (as his counsel suggested) from working at a

shoe store.  More significantly, there is no geographical limitation to this prohibition: it extends

to any such business in the world.   Any covenant restricting competition is to be enforced only

if it goes no further than is necessary to protect the employer's legitimate business interests.

Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 497 (1986).   The covenant in the

instant case is not so narrowly tailored.

Reebok responds by contending that a worldwide prohibition is necessary because it has a

worldwide business, and it has a legitimate interest in preventing former employees from

misappropriating its trade secrets and other confidential information for use by its competitors.

Reebok fails to identify this confidential information with any precision, however.  It alludes

generally to marketing strategies, product design and development plans, and customer

relationships without demonstrating (at least to this Court's satisfaction) that this is the kind of

information worthy of protection or which is even sufficiently defined to be the subject of a court

order.  Reebok also argues that it has invested time and money in training Rattet.  But public

policy requires that  employees be able to carry away and use the general skill or knowledge

acquired during the course of their employment.  Dynamics Research Corp. v. Analytic Science

Corp., 9 Mass. App.Ct. 254, 267 (1980).  Finally, although Reebok contends that it has e-mails

showing that  Rattet has already taken proprietary information from the company, it failed to

produce any of the emails – perhaps because they are not as incriminating as Reebok has

described them to be. [1]

Finally, this Court consider the relative harm to each party occasioned by the issuance or

denial of an injunction.  The defendant is a married father of two children with a third on the

way.  Although he would be entitled to half his base salary ($65,000), that is without any benefits.

In the meantime, he would be prohibited from earning a livelihood for the next year in a field he

---

[1]These e-mails were reportedly sent to his wife, a former Reebok employee who is now a
homemaker. Although Rattet admits discussing business with his wife and communicating with
her by e-mail when his work with Reebok took him overseas, he denies in his affidavit that the
purpose of these communications was to remove confidential information from Reebok so that
he could use it with Under Armour.  Without the e-mails themselves, this Court sees no reason to
simply to accept Reebok's characterization of these communications.

has worked in since he graduated from college. The plaintiff on the other hand is a corporate

giant which already dominates the athletic footwear business. It will almost certainly survive the

loss of a middle level employee without sustaining significant harm. Moreover, that harm would

appear to be strictly economic, which is compensable by money damages. See IKON Office

Solutions, Inc. v. Belanger, 59 F.Supp.2d 125, 132 (1999) (possible loss of customers or good

will through improper solicitation is not necessarily irreparable harm).

In the final analysis, this is an appeal to the Court's equitable powers. In determining

whether to exercise those powers, this Court strives to do what is fair, based on the facts before it

and keeping in mind that the plaintiff bears the burden of showing that it is entitled to the relief

that it seeks.    This Court concludes that Reebok has failed to sustain that burden and that

enforcing this broad non competition covenant so as to prevent Rattet from accepting this new

employment opportunity would not be the fair thing to do.

## CONCLUSION AND ORDER

For all the foregoing reasons, the Motion for a Preliminary Injunction is **DENIED**.

Janet L. Sanders
Justice of the Superior Court

Dated: April 29, 2008

8